# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

| | |
|---|---|
| **DARRELL WAYNE FREDERICK,** ) | |
| **Petitioner/Appellant,** ) | **Case No. 20-6131** |
| ) | |
| **v.** ) | **(Capital Case)** |
| ) | |
| **JIM FARRIS, Warden,** ) | |
| **Oklahoma State Penitentiary,** ) | |
| **Respondent/Appellee.** ) | |

On Appeal from the United States District Court
for the Western District of Oklahoma
The Honorable Scott L. Palk, United States District Judge
District Court No. CIV-19-37-SLP

## OPENING BRIEF OF PETITIONER/APPELLANT
## DARRELL WAYNE FREDERICK

### ORAL ARGUMENT IS REQUESTED

MEGHAN LeFRANCOIS, OBA No. 32643
EMMA V. ROLLS, OBA No. 18820
Assistant Federal Public Defenders
215 Dean A. McGee, Suite 707
Oklahoma City, Oklahoma 73102
(405) 609-5975 - Telephone
(405) 609-5976 - Facsimile
Meghan_LeFrancois@fd.org
Emma_Rolls@fd.org

COUNSEL FOR APPELLANT,
DARRELL WAYNE FREDERICK

October 22, 2021

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF ATTACHMENTS .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

GLOSSARY OF ABBREVIATIONS TO RECORD REFERENCES . . . . . . . . viii

PRIOR OR RELATED APPEALS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

PROPOSITION ONE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL AND ON APPEAL
VIOLATED FREDERICK'S SIXTH, EIGHTH, AND FOURTEENTH
AMENDMENT RIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

A.   Where the Claim Was Raised.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

B.   Arguments and Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

  1.   Failure to Adequately Investigate, Develop, and Present Evidence to
       Rebut that Ms. Frederick's Manner of Death Was Homicide... . . . . . . 8

       a.   Failure to Consult with and Present an Independent Forensic
            Pathologist.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
            i.    Counsel Performed Deficiently... . . . . . . . . . . . . . . . . . . 13
            ii.   The District Court Erred by Endorsing OCCA's
                  Prejudice Determination.. . . . . . . . . . . . . . . . . . . . . . . . . . 15

   b. Failures Related to the Testimony of Dr. Harrison.. . . . . . . . 22
    i. Counsel Performed Deficiently.. . . . . . . . . . . . . . . . 24
    ii. The District Court Erred by Endorsing OCCA's
     Prejudice Determination. . . . . . . . . . . . . . . . . . . . 25

  2. Failure to Adequately Investigate, Develop, and Present Mitigating
   Evidence in Sentencing Stage.. . . . . . . . . . . . . . . . . . . . . . . . . . 29

   a. The Mitigation Evidence Defense Counsel Presented.. . . . . . 30

   b. The Evidence Defense Counsel Did Not Present.. . . . . . . . . 32
    i. Evidence from Family Witnesses.. . . . . . . . . . . . . . . 32
     a. Abuse and Dysfunction in the Frederick Home. 32
     b. Positive Evidence.. . . . . . . . . . . . . . . . . . . . 37
     c. Failure to Investigate. . . . . . . . . . . . . . . . . . 40
     d. The District Court Erred by Endorsing OCCA's
      Performance and Prejudice Determinations.. . . 43
      i. Performance. . . . . . . . . . . . . . . . . . . . . 43
      ii. Prejudice. . . . . . . . . . . . . . . . . . . . . . 55

    ii. Dr. Art Williams.. . . . . . . . . . . . . . . . . . . . . . . . . . 57
     a. The District Court Erred by Endorsing OCCA's
      Performance and Prejudice Determinations. . . . 59
      i. Appellate IAC.. . . . . . . . . . . . . . . . . . 59
      ii. Underlying Trial IAC.. . . . . . . . . . . . . . 60

    iii. Evidence of Brain Damage. . . . . . . . . . . . . . . . . . . 63
     a. Counsel Performed Deficiently. . . . . . . . . . . . 68
     b. The District Court Erred by Endorsing OCCA's
      Prejudice Determination . . . . . . . . . . . . . . . . . 74

PROPOSITION TWO. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

THE ACCUMULATION OF ERRORS VIOLATED FREDERICK'S RIGHTS
UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. . . . . 82

A. Where the Claim Was Raised. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

B. Arguments and Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . 84

CERTIFICATE OF DIGITAL SUBMISSION. . . . . . . . . . . . . . . . . . . . . . . 85

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

TABLE OF ATTACHMENTS:

ATTACHMENT A:   Direct Appeal Opinion, *Frederick v. State*,
Case No. D-2015-15,
400 P.3d 786 (Okla. Crim. App. May 25, 2017)

ATTACHMENT B:   Post-Conviction Opinion, *Frederick v. State*,
Case No. PCD-2015-47,
(Okla. Crim. App. Dec. 20, 2018) (unpublished)

ATTACHMENT C:   Memorandum Opinion and Judgment,
*Frederick v. Sharp*, Case No. CIV-19-37-SLP,
(W.D. Okla. July 29, 2020)

# <u>TABLE OF AUTHORITIES</u>

## <u>SUPREME COURT CASES</u>

<u>Page</u>

*Brecht v. Abrahamson*, 507 U.S. 619 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Cullen v. Pinholster*, 563 U.S. 170 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Evitts v. Lucey*, 469 U.S. 387 (1985).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Faretta v. California*, 422 U.S. 806 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*Harrington v. Richter*, 562 U.S. 86 (2011). . . . . . . . . . . . . . . . 19-21, 46, 50, 51, 59

*Hinton v. Alabama*, 571 U.S. 263 (2014). . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 18

*Kimmelman v. Morrison*, 477 U.S. 365 (1986).. . . . . . . . . . . . . . . . . . . . . . . . 55, 73

*Lockett v. Ohio*, 438 U.S. 586 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 54, 61

*Lockhart v. McCree*, 476 U.S. 162 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*O'Neal v. McAninch*, 513 U.S. 432 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Payne v. Tennessee*, 501 U.S. 808 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*Porter v. McCollum*, 558 U.S. 30 (2009). . . . . . . 30, 44, 48, 49, 54, 56, 69, 73, 74

*Rompilla v. Beard*, 545 U.S. 374 (2005).. . . . . . . . . . . . . . . . 13, 24, 30, 49, 73, 74

*Sears v. Upton*, 561 U.S. 945 (2010). . . . . . . . . . . . . . . . . 30, 50, 59, 61, 62, 70, 79

*Strickland v. Washington*, 466 U.S. 668 (1984). . . 7, 13, 16, 17, 22, 27, 43, 51, 55, 59, 62, 69, 74

*Tennard v. Dretke*, 542 U.S. 274 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*Wiggins v. Smith*, 539 U.S. 510 (2003). . . . . . . 13, 24, 30, 43, 44, 50, 51, 54, 56, 57, 61-63, 70,82

*Williams v. Taylor*, 529 U.S. 362 (2000). . . . . . . . . . . . . . . . . 13, 30, 44, 53, 56, 70

## **FEDERAL CIRCUIT COURT CASES**

**Page**

*Allen v. Mullin*, 368 F.3d 1220 (10th Cir. 2004).. . . . . . . . . . . . . . . . . . . . . . . . . 7

*Anderson v. Sirmons*, 476 F.3d 1131 (10th Cir. 2007). . . . . . . . . . 30, 32, 55, 57, 75

*Battenfield v. Gibson*, 236 F.3d 1215 (10th Cir. 2001). . . . . . . . . . . . . . . . . 49, 54

*Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003). . . . . . . . . . . . . 6, 59, 81, 82, 83

*English v. Cody*, 241 F.3d 1279 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . 59

*Gersten v. Senkowski*, 426 F.3d 588 (2d Cir. 2005). . . . . . . . . . . . . . 15, 17, 21, 27

*Grant v. Royal*, 886 F.3d 874 (10th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Hanson v. Sherrod*, 797 F.3d 810 (10th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . 82

*Harmon v. Sharp*, 936 F.3d 1044 (10th Cir. 2019).. . . . . . . . . . . . . . . . . . . . . . . 22

*Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012). . . . . . . . . . . . . 55, 69, 75, 81

*Le v. Mullin*, 311 F.3d 1002 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*Littlejohn v. Trammell*, 704 F.3d 817 (10th Cir. 2013) . . . . . . . . . . . . . . . . . . . . 75

*Loyd v. Whitley*, 977 F.2d 149 (5th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Mayes v. Gibson*, 210 F.3d 1284 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . 30, 51, 61

*Mosley v. Atchison*, 689 F.3d 838 (7th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . 32

*Neill v. Gibson*, 278 F.3d 1044 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . 8, 27, 60

*Saiz v. Ortiz*, 392 F.3d 1166 (10th Cir. 2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Smith v. Duckworth*, 824 F.3d 1233 (10th Cir. 2016).. . . . . . . . . . . . . . . . . . . . . 79

*Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004). . . . . . . . . . . . . . . . . 32, 70, 75, 76

*Soffar v. Dretke*, 368 F.3d 441 (5th Cir. 2004). . . . . . . . . . . . . . . . . . . . . 15, 17, 21

*Stouffer v. Reynolds*, 168 F.3d 1155 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . 54

*United States v. Barrett (Barrett II)*, 797 F.3d 1207 (10th Cir. 2015) . . . . . . . . 75

*United States v. Barrett* (*Barrett III*), 985 F.3d 1203 (10th Cir. 2021) . . . . . . . . . 75

*Wilson v. Sirmons*, 536 F.3d 1064 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . 70

*Wood v. Carpenter*, 907 F.3d 1279 (10th Cir. 2018). . . . . . . . . . . . . . . . . . . . . 21

## STATE COURT CASES

*Frederick v. State*, 400 P.3d 786 (Okla. Crim. App. 2017). . . viii, 2, 16, 60, 61, 62

## FEDERAL STATUTES

28 U.S.C. § 2253 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2254. . . . . . . . . . . . . . . . . . . . . 1, 6, 15, 16, 25, 32, 43, 59, 60, 68, 74

## FEDERAL RULES

Fed. R. App. P. 4(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## OTHER AUTHORITIES

American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases," 31 Hofstra L. Rev. 913, 1015 (rev. Feb. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L.Rev. 1538, 1563 (Oct. 1998). . . . . . . . . . . . . . . . . . . 22

## GLOSSARY OF ABBREVIATIONS TO RECORD REFERENCES

| | |
|---|---|
| ROA | Record on Appeal (filings in the federal district court (Vol. I) followed by page number) (Vol. II consists of conventionally filed state court records), |
| O.R. | Five-volume consecutively paginated Original Record in Oklahoma County Case No. CF-2011-1946, followed by page number, |
| Tr. | Eight-volume Jury Trial held Nov. 3-13, 2014, CF-2011-1946, followed by volume number and page number, |
| M.Tr. | Motion Hearing transcripts followed by date and page number, |
| P.H. | Preliminary Hearing held 8-15-11 followed by page number, |
| Sent.Tr. | Formal Sentencing held 1-5-15 followed by page number, |
| St.Ex. | Jury Trial State Exhibit followed by exhibit number, |
| O.R.(PC) | Two-volume consecutively paginated Post-Conviction Original Record in PCD-2015-47, followed by page number, |
| APCR | Application for Post-Conviction Relief, *Frederick v. State*, PCD-2015-47 (Okla. Crim. App. Dec. 2, 2016), |
| APCR Att. | Attachments to Application for Post-Conviction Relief followed by page number, |
| Evid.Hr. | Four-volume Evidentiary Hearing held 9-15-17, 10-19-17, 10-31-17, and 11-21-17, followed by volume number and page number, |
| Evid.Hr. Def.Ex. | Evidentiary Hearing Defense Exhibit followed by exhibit number, |
| Evid.Hr. St.Ex. | Evidentiary Hearing State Exhibit followed by exhibit number, |
| In-Camera Hr.Tr. | In-Camera Hearing held 12-20-13 followed by page number. |

## PRIOR OR RELATED APPEALS

There are no prior or related appeals in this Court.  Prior relevant state court matters include Mr. Frederick's direct appeal from his state court conviction (D-2015-15), which was denied by the Oklahoma Court of Criminal Appeals ("OCCA") in *Frederick v. State*, 400 P.3d 786 (Okla. Crim. App. 2017), *cert. denied,* 138 S. Ct. 997 (2018) (Attachment A).

On state post-conviction, PCD-2015-47, OCCA remanded the case for an evidentiary hearing on the issues of trial and direct-appeal counsel's ineffectiveness. Ultimately, OCCA denied Frederick's application for post-conviction relief ("APCR") in an unpublished decision on December 20, 2018. (Attachment B).  *See* ROA 324-70.

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

| | | |
|---|---|---|
| **DARRELL WAYNE FREDERICK,** | ) | |
| | ) | |
| **Petitioner/Appellant,** | ) | **Case No. 20-6131** |
| | ) | |
| **v.** | ) | **(Capital Case)** |
| | ) | |
| **JIM FARRIS, Warden,** | ) | |
| **Oklahoma State Penitentiary,** | ) | |
| | ) | |
| **Respondent/Appellee.** | ) | |

## OPENING BRIEF OF PETITIONER/APPELLANT
## DARRELL WAYNE FREDERICK

## JURISDICTION

Petitioner/Appellant, Darrell Wayne Frederick ("Frederick"), invoked the jurisdiction of the district court pursuant to 28 U.S.C. § 2254 by timely filing his habeas petition December 16, 2019. ROA 213-417. The district court denied relief in its Memorandum Opinion and Judgment of July 29, 2020, Case No. CIV-19-37-SLP (Attachment C), *see* ROA 617-80, and denied a certificate of appealability on all grounds, ROA 681-82. Judge Murphy granted a certificate of appealability on two grounds from Frederick's Request for a Certificate of Appealability. *See* Order filed Feb. 4, 2021. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 2253 and Fed. R. App. P. 4(a).

## STATEMENT OF THE ISSUES

The district court erred in denying relief or an evidentiary hearing on the following constitutional claims:

1

1(A): Frederick was denied effective assistance of counsel when trial and direct-appeal counsel failed to investigate and present evidence to rebut that Ms. Frederick's manner of death was homicide, including evidence from an independent forensic pathologist and evidence related to Medical Examiner Marc Harrison.

1(B): Frederick was denied effective assistance of counsel when trial and direct-appeal counsel failed to investigate and present mitigating evidence, including evidence of Frederick's abusive childhood, evidence of the effects of his lifelong institutionalization, and evidence of his brain damage.

2: The cumulative effect of otherwise harmless or non-prejudicial errors deprived Frederick of a fair trial and reliable sentencing.

## **STATEMENT OF THE CASE**

On May 2, 2011, Frederick was charged in Oklahoma County District Court, No. CF-2011-1946 with: 1) First Degree Murder (malice aforethought); 2) Attempted Assault with a Dangerous Weapon; and, 3) Domestic Abuse (assault and battery). O.R. 14. Frederick was tried by a jury before Oklahoma County District Judge Timothy Henderson in November 2011. The jury found Frederick guilty of all three counts and sentenced him to death on Count One, after finding three aggravating circumstances: 1) The defendant was previously convicted of a felony involving the use or threat of violence to the person; 2) The murder was especially heinous, atrocious, or cruel; and 3) There exists a probability the defendant will commit criminal acts of violence that will constitute a continuing threat to society. O.R. 928-29.

Frederick's direct appeal (D-2015-15) was denied by OCCA. *Frederick v. State*, 400 P.3d 786 (Okla. Crim. App. 2017). Certiorari was also denied. *Frederick v. Oklahoma*, 138 S. Ct. 997 (2018).

2

On post-conviction, PCD-2015-47, OCCA remanded the case for an evidentiary hearing before Judge Henderson on the issues of trial and direct-appeal counsel's ineffectiveness, as well as other issues not addressed in this appeal. Ultimately, OCCA denied Frederick's APCR.

Frederick timely filed his Petition for Writ of Habeas Corpus. ROA 213-322. The district court denied habeas relief, discovery, an evidentiary hearing, and a certificate of appealability. ROA 617-82. This appeal was timely commenced. ROA 683-84.

## STATEMENT OF FACTS

In 2009, Frederick returned to his mother's home after an acquittal in an unrelated case. Tr.IV 912-13. By all accounts, Frederick and his mother, 85-year-old Connie Frederick ("Ms. Frederick"), enjoyed a loving relationship. He provided care to his aging mother, who was deaf and mute. He took care of daily tasks, including cooking, shopping, cleaning, and helping his mother bathe. APCR Atts. 28-31; Evid.Hr.I 65-66, 74-77, 80-81, 87-88, 94-97, 133-34.

On March 26, 2011, Da'Jon Diggs went to the home of her grandmother, Ms. Frederick. Diggs alleged she witnessed Frederick (Diggs's uncle) and Ms. Frederick "fussing" over food in the kitchen.[1] Tr.IV 820-21. Diggs testified that at the culmination of their fussing, Frederick pushed Ms. Frederick against a counter. Tr.IV 823-24. Ms. Frederick pushed back, and, according to Diggs, Frederick then shoved Ms. Frederick. Tr.IV 824. Diggs intervened and took Ms. Frederick to her bedroom.

---

[1] Due to Ms. Frederick's advanced age, Frederick had safety concerns regarding her cooking. In the past, she had forgotten to turn the stove off. Evid.Hr.I 66, 94.

3

Tr.IV 825. Diggs then returned to the kitchen where she and Frederick argued more about food. Tr.IV 826.

Diggs testified she next went to the store to get her grandmother some juice. Tr.IV 828. While en route, she called her mother, Judith Frederick-Jones, and her uncle, Oklahoma City Police Department Sergeant Tobias Frederick ("Sgt. Frederick"), to complain about Frederick. Tr.IV 828-29. When she returned home, she heard Frederick yelling on the phone and knew from context the caller was Sgt. Frederick. Tr.IV 830-32.

Diggs returned to Ms. Frederick's room, gave her the juice, and told her to stay there. Tr.IV 832. Diggs claimed as soon as she closed the bedroom door and turned around, Frederick charged her. Tr.IV 833. The two began fighting, and Diggs ran outside. Tr.IV 834-35. Neighbors saw Frederick pick up a rock or "something" and chase Diggs. Tr.IV 835. Diggs ran to a next-door neighbor's house and called 911. Tr.IV 835, 848. Diggs testified Frederick went back in the house and soon came out again. Tr.IV 836-37. He then went back inside.[2] Tr.IV 885.

The police arrived within a minute and entered the house. Tr.IV 838, 886-87. They, along with Diggs, found Ms. Frederick on the floor of her bedroom, face down. Tr.IV 839. Diggs lifted and rolled Ms. Frederick over and saw her face was swollen and bruised. Tr.IV 839. Frederick was not in the house. Tr.IV 953, 966. Diggs testified a male police officer asked her to ask her grandmother whether she was in

---

[2]There is contradiction in the record as to whether Frederick went back in the house the second time before police arrived. Tr.IV 837-38, 847, 885-91, 900, 903-04.

pain and "Who did it?".[3] Tr.IV 840. Diggs testified her grandmother raised her hand upwards – almost to her temple – and made a "D" sign. Tr.IV 840. According to Diggs, the sign her grandmother used for Darrell was "D" at her temple.[4] Tr.IV 840. Soon thereafter, the ambulance arrived and placed Ms. Frederick on a stretcher. Tr.IV 842-43. Paramedic Adam Simmons testified he asked Diggs to elicit information from Ms. Frederick about what happened. Tr.V 990. He testified Ms. Frederick, through Diggs, said her son hit her with an unknown object an unknown number of times. Tr.V 992.

Ms. Frederick remained in the hospital until her death on April 30, 2011. Tr.V 1138. According to the State's medical examiner ("M.E."), her cause of death was "traumatic head injury, blunt force." Tr.V 1134.

Frederick was originally represented by Catherine Hammarsten. O.R. 18. On December 20, 2013, approximately 11 months before Frederick was tried, James Rowan replaced Hammarsten as counsel. M.Tr. 12/20/13 at 18; Evid.Hr.I 187-88. Rowan did virtually no investigation for either the guilt or sentencing stage of trial, Evid.Hr.I 192, 200-01, 204-06, nor did he call a single live witness.

---

[3]Because Ms. Frederick communicated by sign language, Diggs acted as an interpreter. *Id.* at 811.

[4]Sgt. Aaron Ulman, the responding officer who was with Diggs when she found Ms. Frederick, testified he did not recall Ms. Frederick making a sign indicating Frederick had attacked her. Tr.IV 961. If he had observed such a thing, he would have noted it in his report, which includes no mention of this alleged interaction. Tr.IV 962.

## SUMMARY OF ARGUMENT

Counsel was ineffective in both stages of Frederick's trial. Counsel failed to adequately investigate, develop, and present critical evidence that would have rebutted the State's first-stage evidence and argument that Ms. Frederick's death was a homicide. In the sentencing stage, counsel failed to reasonably investigate, develop, and present compelling mitigating evidence, including Frederick's family and social histories and evidence of brain damage. Appellate counsel then failed to investigate, develop, and present this evidence to OCCA. Trial and appellate counsel's failures prejudiced Frederick and constituted ineffective assistance of counsel ("IAC").

## STANDARD OF REVIEW

This Court reviews legal determinations of a district court *de novo* and factual determinations for clear error. This Court's review is additionally governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under the AEDPA, when a state court has considered a claim on the merits, this Court will reverse only if the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). This Court's *de novo* review of the district court's legal analysis of the state court decision permits rebuttal of any factual findings. *Saiz v. Ortiz*, 392 F.3d 1166, 1176 (10th Cir. 2004).

When a state court has not considered a claim on the merits, this Court "is not constrained by the deference principles in § 2254(d)" and reviews the district court's legal decisions *de novo* and factual findings for clear error. *Cargle v. Mullin*, 317

F.3d 1196, 1212 (10th Cir. 2003). Where a district court hasn't conducted an evidentiary hearing and has before it only those facts developed in the state court, this Court independently reviews the same. *Allen v. Mullin*, 368 F.3d 1220, 1234 (10th Cir. 2004).

## PROPOSITION ONE

### INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL AND ON APPEAL VIOLATED FREDERICK'S SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS.

### A.    Where the Claim Was Raised.

This claim was raised in Ground One of Frederick's habeas petition, ROA 226-310, and in his Motion for Evidentiary Hearing, ROA 427-28. The district court denied relief. ROA 631, 635-36, 650, 655, 664-65, 678.

### B.    Arguments and Authorities.

Rowan's first-stage strategy was to convince the jury Ms. Frederick had fallen rather than being beaten with a brick. ROA 372, ¶ 3. Yet Rowan failed to present evidence to support this theory. He didn't consult with a single medical expert, including the M.E. who performed Ms. Frederick's autopsy. Evid.Hr.I 192. As for the sentencing phase, the entire mitigation case was the 1982 testimony of Frederick's deceased father, read into the record. Tr.VIII 1496-1514. Rowan did not retain any mental health experts. Evid.Hr.I 200-01. Nor did he interview or ask any family members of Frederick to testify. Evid.Hr.I 205. Instead, Rowan "blew them off completely." Evid.Hr.I 238-39.

The Sixth Amendment guarantees a criminal defendant the reasonably effective assistance of counsel. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme

Court made clear when counsel provides deficient performance, resulting in prejudice, judicial relief is necessary. On post-conviction, counsel raised several claims of appellate IAC for failing to raise instances of trial IAC. OCCA found no IAC and denied Frederick's APCR. OCCA's findings were unreasonable as to law and fact.

### 1. Failure to Adequately Investigate, Develop, and Present Evidence to Rebut that Ms. Frederick's Manner of Death Was Homicide.

Rowan made his strategy clear: "My first stage strategy was to attempt to convince the jury that the State's cause and/or manner of death was incorrect." ROA 372, ¶ 3. Specifically, he wanted to convince the jury Ms. Frederick's injury "was more consistent with a fall resulting from a medical condition than the State's theory that Mr. Frederick beat her with a brick." *Id.* Yet Rowan failed to consult with any medical expert, including Dr. Marc Harrison, the M.E. who performed Ms. Frederick's autopsy. *Id.*; Evid.Hr.I 192. As a result, Rowan didn't present persuasive evidence to rebut the State's case or adequately cross-examine Harrison about inaccurate information on which Harrison relied to conclude Ms. Frederick's death was a homicide. Were it not for Rowan's deficient performance, there exists a reasonable probability Frederick would have been acquitted of first-degree murder.

Direct-appeal counsel, Gina Walker, was charged with raising trial IAC. *Evitts v. Lucey*, 469 U.S. 387 (1985). Walker's failure to fully develop and present each claim of trial IAC rendered Walker ineffective. *Neill v. Gibson*, 278 F.3d 1044, 1057 n.5 (10th Cir. 2001) (holding appellate counsel ineffective for not raising claims with a reasonable probability of success).

8

### a.    Failure to Consult with and Present an Independent Forensic Pathologist.

The State's theory was that Frederick caused Ms. Frederick's death by beating her in the head with a brick or unknown object. O.R. 14; Tr.IV 793-94; Evid.Hr.I 33. In support of its theory, the State presented the following evidence: Da'Jon Diggs testified Frederick chased her from Ms. Frederick's home with a brick, Tr.IV 779-81; Jazmyn Franklin testified she witnessed Frederick outside the Frederick home with a "dark reddish-colored thing" in his hand "like a brick," Tr.IV 903; an Oklahoma City Police Crime Scene Investigator testified he had been informed by his supervisor Ms. Frederick had been assaulted, possibly with "a brick or large rock," Tr.V 1059, and he had discovered three bricks in the home, Tr.V 1062-63; and during Diggs's testimony she identified a brick in a photograph as the brick found in the hallway, Tr.IV 855; St.Ex. 14. The three bricks found in the home tested negative for blood or tissue. Tr.V 1110.

The State's case hinged on medical experts: Dr. Hahn, Ms. Frederick's treating neurosurgeon, and Dr. Harrison, the M.E. Hahn treated Ms. Frederick after her admission to the hospital. Tr.V 1005. A CT scan showed a large subdural hematoma, which necessitated a craniotomy to relieve pressure on the brain. Tr.V 1009. Hahn opined her injuries were "a little bit more than what [he] would expect" from a fall. Tr.V 1013. Harrison concluded Ms. Frederick's cause of death was "traumatic head injury, blunt force" and the manner of death was homicide. Tr.V 1134-35. Rowan never asked Harrison whether Ms. Frederick's injuries were consistent with being hit by a brick or unknown object. The State highlighted these experts' testimony during

its closing. Tr.VI 1190.

The State's theory had numerous vulnerabilities, all of which could have been exploited by an appropriate medical expert had trial counsel performed effectively. For example, during the preliminary hearing, Diggs testified Ms. Frederick had a medical condition, which caused her to faint a couple of years prior to her death. P.H. 67-68. During trial, Diggs testified that on that occasion, Ms. Frederick exclaimed, "Oh, my chest," prior to collapsing. Tr.IV 892. Also during the preliminary hearing, Sgt. Frederick testified Ms. Frederick was "a borderline diabetic." P.H. 122. He was aware she had been transported by ambulance to the hospital on a prior occasion after passing out. P.H. 122. At trial, however, Rowan never asked Sgt. Frederick about his preliminary hearing testimony regarding Ms. Frederick's history of passing out.

During cross-examination of Hahn, Rowan briefly explored a possible connection between Ms. Frederick's medical history and the injuries she sustained. Hahn agreed her injuries were "consistent with falling as well as being hit by something." Tr.V 1019. He also agreed Ms. Frederick's enlarged heart created an increased risk for falling. Tr.V 1020. Despite these initial concessions, on redirect, Hahn agreed with the State that Ms. Frederick's injuries were more "indicative" of "force than a fall in the home." Tr.V 1024-25.

In Frederick's demurrer, Rowan argued "it could've been a fall," and an "accident was [not] ruled out." Tr.V 1143. The court concluded enough evidence had been presented to support the State's theory that Frederick "laid his hands on her or hit her with a brick." Tr.V 1148. During closing arguments, Rowan reiterated his theory Ms. Frederick could have either slipped and fallen or suffered a medical

10

condition causing her to fall. Tr.VI 1205-07.  In response, the State capitalized on Rowan's failure to present any supporting evidence: "There's nothing -- you haven't heard a bit of evidence to indicate that this was a fall. Not a bit." Tr.VI 1224. In the end, the jury was forced to choose between Rowan's unsupported argument or the testimony of two medical experts.

Had Rowan consulted with a forensic pathologist, like Dr. Robert Bux,[5] he could have presented compelling medical evidence to rebut the State's theory. Bux reviewed relevant trial testimony, Harrison's autopsy report, a photograph of Ms. Frederick as she appeared at the scene (Evid.Hr. St.Ex. 6), Ms. Frederick's medical records, and the Oklahoma City Police Department investigative file. Evid.Hr.II 315. Bux concluded:

> • The blunt force trauma that caused Ms. Frederick's head injury was consistent with an accidental fall or a fall resulting from a medical event. Evid.Hr.II 340.
>
> • Ms. Frederick's left-side facial paralysis depicted in State's Exhibit 6 was more consistent with a transient ischemic attack (TIA) or stroke than swelling because the area of drooping was not in the area described by medical observers or in Ms. Frederick's medical records as the injured area or point of impact. Evid.Hr.II 334-35.
>
> • The medical evidence did not support the State's theory that Ms. Frederick was hit repeatedly in the head with a brick. Specifically, Ms. Frederick exhibited no patterned injury, facial fractures, lacerations, abrasions, or external bleeding. Evid.Hr.II 323-24.

---

[5] Post-conviction counsel called Dr. Bux at the post-conviction evidentiary hearing. He is board-certified in anatomical, clinical, and forensic pathology. APCR Att. 11, Ex.1 (Bux C.V.).

• Individuals of advanced age who have cerebral atrophy[6] are more likely to have severe subdural bleeding with relatively the same amount of force due to tension on the bridging veins. Evid.Hr.II 337-39; APCR Att. 11, Ex.2 at ¶ 8.

• The absence of evidence of a struggle in Ms. Frederick's bedroom, defensive injuries to Ms. Frederick's body, a weapon at the scene, and DNA evidence weighed against the State's brick theory. Evid.Hr.II 341.

• Had Bux served as the M.E., he would have listed the manner of death as undetermined. Evid.Hr.II 341.

During the evidentiary hearing, Harrison's testimony was, at times, consistent with Bux's findings. Harrison said he could not rule out an accidental fall as the source of Ms. Frederick's injuries and his autopsy findings were consistent with the scenario of Ms. Frederick's head striking a piece of furniture or the floor. Evid.Hr.II 281. He also agreed the photograph taken of Ms. Frederick prior to her transport to the hospital, Evid.Hr. St.Ex.6, indicates drooping of the left side of her face consistent with a TIA or stroke and he couldn't rule out a fall associated with such a medical event. Evid.Hr.II 282-83, 290. He also explained that due to Ms. Frederick's brain atrophy and her daily ingestion of aspirin, she was at greater risk to suffer subdural hematoma. Evid.Hr.II 272-73. Frederick's jury never heard these concessions because Rowan failed to adequately cross-examine Harrison.

Remarkably, OCCA did not mention Bux in its discussion of this claim.[7] OCCA disposed of the claim by stating: "Petitioner has failed to show any prejudice

---

[6]Harrison reported Ms. Frederick suffered from mild to moderate brain atrophy due to her advanced age. Evid.Hr.II 272; Evid.Hr. St.Ex.4 (M.E. Rpt. at 6).

[7]Other than a reference to Bux in a footnote wherein OCCA simply listed Frederick's propositions of error, ROA 331 n.3, Bux's name appears nowhere else, and there is no discussion of his evidentiary hearing testimony or his report.

by appellate counsel's alleged shortcomings as this Court has sufficient record to thoroughly review his claims for post-conviction relief." ROA 334.

### i.    Counsel Performed Deficiently.

OCCA made no performance determination. ROA 334. Neither did the district court. ROA 627 ("Like the OCCA, this Court elects to dispose of Petitioner's claim by reviewing the prejudice prong of *Strickland.*"). Hence, *de novo* review applies to this element. *Rompilla v. Beard*, 545 U.S. 374, 390 (2005).

"The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. In assessing performance, the Supreme Court emphasizes a case-by-case approach that considers "all the circumstances."[8] *Id.* "[T]he Sixth Amendment imposes on counsel a duty to investigate, because reasonably effective assistance must be based on professional decisions and informed legal choices" made *after* investigation of options. *Id.* at 680. *See also Wiggins*, 539 U.S. at 527-28. This is especially true when counsel knows the prosecution will likely rely on a theory that hinges on forensic science.

Here, Rowan knew the State's theory, since the filing of the Information, was that Frederick killed Ms. Frederick by "hitting her in the head with an unknown

---

[8]"[T]he standards for capital defense work articulated by the American Bar Association (ABA) [are] standards to which [the Supreme Court has] long referred as 'guides to determining what is reasonable.'" *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting *Strickland*, 466 U.S. at 688; *Williams v. Taylor*, 529 U.S. 362, 396 (2000)).    Guideline 10.7 of the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases requires defense counsel "to conduct thorough and independent investigations relating to the issues of both guilt and penalty." 31 Hofstra L. Rev. 913, 1015 (rev.ed. Feb. 2003).

object." O.R. 14. Further, based on pretrial filings, Rowan should have been aware the State alleged, albeit mistakenly, that Harrison would testify Ms. Frederick's "skull was crushed in several places."[9] O.R. 101. Yet Rowan did nothing to investigate or present evidence to counter the State's case. He admitted as much. ROA 372 (admitting he didn't interview the M.E. or consult with an independent forensic pathologist before trial); Evid.Hr.I 192-93 (admitting he didn't consult any medical experts and had no strategic reason for failing to do so; admitting despite having interviewed M.E.'s in other cases, he didn't attempt to interview Harrison; and admitting that testimony from medical experts stating Ms. Frederick's injuries were consistent with a fall would have benefitted defense). Without competent assistance from a medical expert, Rowan couldn't effectively confront the State's case or establish Frederick's innocence.

In *Hinton v. Alabama*, 571 U.S. 263, 273-75 (2014), a unanimous Supreme Court found counsel's performance deficient for failing to obtain an adequate expert. The Court recognized the risk of wrongful convictions based on faulty forensic science and that "[t]his threat is minimized when the defense retains a competent expert to counter the testimony of the prosecution's expert witnesses." *Id.* at 276. In *Hinton*, counsel's deficient performance – his choice of an unqualified expert – stemmed from his mistake of law. *Id.* at 275. But counsel can also be ineffective based on an incomplete or nonexistent investigation of the facts: "The selection of

---

[9]At the evidentiary hearing, Harrison testified Ms. Frederick had no skull fractures and any characterization of her injuries as skull crushing wouldn't be accurate. Evid.Hr.II 284.

14

an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts', is 'virtually unchallengeable.'" *Id.* Thus, *Hinton* counsels that an attorney *must* conduct a thorough investigation of both law and facts before making choices about what experts to call or whether to call an expert at all.

"Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence." *Hinton*, 571 U.S. at 273. *See, e.g., Soffar v. Dretke*, 368 F.3d 441, 477-78, 480 (5th Cir. 2004); *Loyd v. Whitley*, 977 F.2d 149, 156-61 (5th Cir. 1992); *Gersten v. Senkowski*, 426 F.3d 588, 611, 615 (2d Cir. 2005) (all cases granting relief based on IAC for failure to call experts). Under the circumstances of Frederick's case, it should have been obvious to any reasonably effective lawyer the assistance of a skilled medical expert was crucial. Trial and appellate counsel's failure to investigate, obtain, and present a competent medical expert, like Bux, fell below what the Constitution requires.[10]

### ii. The District Court Erred by Endorsing OCCA's Prejudice Determination.

Had Rowan obtained the assistance of a medical expert, like Bux, there exists a reasonable probability Frederick would have been acquitted of first-degree murder. OCCA's finding of no prejudice was an unreasonable application of *Strickland* and contrary to its progeny. § 2254(d)(1). Insofar as IAC claims involve a mixed question

---

[10]Direct-appeal counsel's belated hiring of Dr. Bux and the belated and improper presentation of this claim demonstrate her failure wasn't strategic.

of law and fact, *Strickland*, 466 U.S. at 698, OCCA's no-prejudice finding is based on unreasonable factual determinations. § 2254(d)(2). When assessing prejudice arising from counsel's deficient performance, this Court must consider the strength of the State's case. *Strickland*, 466 U.S. at 696. The State's case against Frederick was weak. There was no eyewitness to the alleged attack of Ms. Frederick. Evid.Hr.I 24-25, 60-61. She had no skull or face fractures. Evid.Hr.II 284. Her face had no pattern injuries, lacerations, or external bleeding. Evid.Hr.II 323-24.There was no blood or tissue of Ms. Frederick recovered at the scene, including from the bricks recovered from the home. Tr.V 1110. She had no defensive wounds. Evid.Hr.II 341; Evid.Hr. St.Ex. 4. There was no evidence of a struggle in the bedroom where she was found. Evid.Hr.II 341. There was no weapon recovered. Tr.IV 794; Tr.V 1110, 1141. And Ms. Frederick's medical history made her prone to falling. Tr.V 1020.

Insofar as OCCA ignored these frailties in the State's case to conclude counsel's failure to consult with and present a medical expert didn't prejudice Frederick, it engaged in unreasonable fact finding.[11] § 2254(d)(2). The failure to consider these frailties also constitutes an unreasonable application of *Strickland*, which holds a prejudice analysis must include a review of the totality of the evidence and that a verdict only "weakly supported by the record is more likely to have been

---

[11]On direct appeal, OCCA unreasonably determined "[Ms. Frederick's] head injuries were so severe that her skull was actually crushed in several places." *Frederick*, 400 P.3d at 817. This statement is false. *See* Evid.Hr.II 284. OCCA did not correct this unreasonable factual determination in its post-conviction opinion. OCCA's misapprehension of the evidence demonstrates its no-prejudice finding was based on an unreasonable factual determination.

affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 695-96. *See e.g., Gersten*, 426 F.3d at 613-14 (finding state court's determination of no prejudice unreasonable where "counsel's failures go to something as important as the medical evidence . . . – the only objective evidence that a crime occurred" and finding where the record evidence is thin and "not effectively challenged by defense experts or an informed cross-examination," there is more likely to be prejudice); *Soffar*, 368 F.3d at 478-49 (finding petitioner was prejudiced by counsel's failure to consult with and call ballistics expert where petitioner confessed, but there was no eyewitness to the alleged crime, no forensic evidence linking petitioner to crime, and no murder weapon recovered).

In light of the weaknesses in the State's case, Harrison and Hahn were critical to the State's case. The State acknowledged as much in its closing arguments:

> We have brought you evidence in the form of a neurosurgeon. . . . What did he tell you? This wasn't a result of a fall. I think he made – at some point said, well, maybe if she was standing up on something four to six feet up in the air. And the question was asked, would you expect to see some other fractures if she just did a header, like, maybe some broken bones in her arms or someplace. And he said yes. Dr. Hahn knows what he's doing. Dr. Hahn was Connie Frederick's treating physician. And he told you this was not a fall. This was blunt force trauma.[12] . . .

> So you've got Dr. Marc Harrison who viewed the body of Connie Frederick. Opened up the body and the brain cavity of Connie Frederick. And he's telling you that the manner of death is homicide. Not an accident. Not a fall. But homicide. . . . .

> The . . . field of medical expertise is a complicated one. We brought in

---

[12]The prosecutor's argument implies a fall cannot result in blunt force trauma. However, they are not mutually exclusive. "Blunt force trauma is any injury that you receive when you're struck or you strike against a blunt object." Evid.Hr.II 318.

the witnesses . . . Dr. Hahn and Dr. Harrison. And they both[13] . . . indicated to you based upon their training and experience and their observations . . . this was not consistent with a fall. It was blunt force trauma.

Tr.VI 1224-26, 1228. Without an expert, the defense left the State's theory unrebutted.

In *Hinton*, the Supreme Court emphasized the importance of competent defense expert testimony as part of its prejudice analysis:

> That the State presented testimony from two experienced expert witnesses that tended to inculpate Hinton does not, taken alone, demonstrate that Hinton is guilty. Prosecution experts . . . can sometimes make mistakes. . . . "One study of cases in which exonerating evidence resulted in the overturning of criminal convictions concluded that invalid forensic testimony contributed to the convictions in 60% of the cases." . . . *This threat is minimized when the defense retains a competent expert to counter the testimony of the prosecution's expert witnesses*.

*Hinton*, 571 U.S. at 276 (emphasis added) (internal citations omitted). Had Rowan consulted with and called an expert, like Bux, the defense could have countered the State's experts, and the jury would have learned the blunt force trauma that caused Ms. Frederick's head injury was consistent with an accidental fall or a fall resulting from a medical event. Any finding of no prejudice is unreasonable as to both fact and law.

The district court's conclusion that OCCA's no-prejudice finding was reasonable is clearly erroneous. With respect to the prejudice flowing from counsel's failure to consult with and present an independent medical examiner, the district court

---

[13]The State's argument that Harrison testified Connie Frederick's injury wasn't consistent with a fall is a mischaracterization of Harrison's testimony. Harrison was never asked this question.

18

first found:

> In *Harrington v. Richter*, 562 U.S. [86,] 112 [2011], the Supreme Court held that the state court reasonably concluded the defendant was not prejudiced by trial counsel's failure to call a blood evidence expert because the expert testimony "established nothing more than a theoretical possibility" that was consistent with the defense theory and counsel was able to "extract[] a concession along these lines from the prosecution's expert" at trial. Similarly, here, Petitioner's expert offers nothing more than the possibility that Ms. Frederick's injuries were the result of a fall, a theory which was explored by defense counsel at trial.

ROA 628. Because of the striking contrasts between *Richter* and Frederick's case, the district court's reliance on *Richter* is misplaced.

In *Richter*, the Supreme Court found the defendant was not prejudiced by trial counsel's failure to hire an expert serologist to challenge the State's blood evidence. 562 U.S. at 112-13. But unlike Frederick's case, there was compelling evidence of the defendant's guilt on which the Court premised its no-prejudice finding, including the eyewitness testimony of one of the victims, evidence at the scene corroborating the eyewitness testimony, evidence at the defendant's residence corroborating the eyewitness testimony, and the defendant's shifting story concerning his involvement in the crime. *Id.* at 93-94, 113. Further, unlike Frederick's counsel, who called no witnesses in first stage, Richter's trial counsel called seven witnesses, including Richter himself, who implicated the two victims for initiating the shooting. *Id.* at 95.

In contrast to the overwhelming evidence of the defendant's guilt in *Richter*, the State's case against Frederick was weak. *See supra* at 16. Frederick made no inculpatory statements. And Ms. Frederick's medical history made her prone to falling. Tr.V 1020.

Further, *Richter* does not support the district court's characterization of Bux's

19

testimony as "offer[ing] nothing more than the possibility that Ms. Frederick's injuries were the result of a fall," which Rowan adequately "explored" during cross-examination of the State's experts. ROA 628. In *Richter*, the defense asserted Richter's co-defendant had fired at the surviving victim in self-defense and that the deceased victim was killed in the crossfire in the bedroom doorway. 562 U.S. at 94-95. The Court held the defendant failed to establish prejudice because

> [h]is expert serology evidence established nothing more than a theoretical possibility that, in addition to blood of [the surviving victim's] type, [the deceased victim's] blood may also have been present in a blood sample taken near the bedroom doorway pool. At trial, defense counsel extracted a concession along these lines from the prosecution's expert.

*Id.* at 112.

Bux's evidentiary hearing testimony and report established far more than a "theoretical possibility" the State's proposed manner and cause of death were inaccurate. With over 40 years experience as a board-certified forensic pathologist, APCR Att. 11, Ex.1 (Bux C.V.), Bux has far more experience than Harrison, Tr.V 1121-22. Bux did not equivocate about his conclusion: Based on his review of the evidence, Bux concluded the evidence was inconsistent with the State's brick theory and he would have listed Ms. Frederick's manner of death as undetermined. Evid.Hr.II 341. His steadfast adherence to this conclusion contrasts starkly with Harrison's evidentiary hearing testimony in which he at one point testified he could not rule out an accidental fall as the source of Ms. Frederick's injuries based on the condition of her body yet later contradicted himself. Evid.Hr.II 281, 298, 302.

Contrary to the district court's findings, Rowan's limited foray in which he

"explored" Ms. Frederick's history of falling through cross-examination did not staunch the prejudice flowing from his failure to consult with and call an independent medical examiner. Unlike *Richter,* where defense counsel was able to extract concessions from the prosecution's blood experts that their conclusions were "imprecise" and certain known samples had not been tested, 562 U.S. at 94-95, here trial counsel extracted no such helpful concessions from Harrison. During the remanded evidentiary hearing, Harrison's testimony was oftentimes consistent with Bux's evidentiary hearing testimony and report. *See supra* at 11-12. But Harrison did *not* testify to this information at Frederick's trial because Rowan failed to adequately cross-examine him.

The district court next found the following: "This was not, as Petitioner argues, a case that hinged entirely on expert medical testimony." ROA 629. The district court is incorrect. The prosecutors twice acknowledged the integral nature of expert medical testimony during first stage closing arguments. *See supra* at 17-18. The centrality of expert medical testimony in Frederick's case is closely analogous to the role of expert testimony in *Gersten*, 426 F.3d at 613-14, and in *Soffar*, 368 F.3d at 478-79.

The district court also found:

> In attempting to overcome AEDPA, Petitioner argues that the OCCA engaged in unreasonable factfinding to the extent it ignored certain "frailties in the State's case." The Court doubts that "ignoring evidence can be considered a factual determination." *Wood v. Carpenter*, 907 F.3d 1279, 1298 (10th Cir. 2018). But in any event, Petitioner fails to show that OCCA did not consider any alleged weaknesses in the State's case in assessing whether counsel was ineffective. Rather, the OCCA reasonably concluded that that [sic] any weaknesses were eclipsed by the other evidence pointing to guilt.

ROA 630. The district court failed to consider that any prejudice analysis must include a review of the totality of the evidence and that a verdict only "weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 695-96. Here, OCCA's unreasonable no-prejudice determination did not even mention Bux's evidentiary hearing testimony or report, let alone consider it as part of the totality of the evidence. ROA 231 & n.9. Nor did OCCA grapple with the many vulnerabilities in the State's case that could have been addressed by someone like Bux. *See supra* at 16 (addressing the numerous inconsistencies with the State's brick theory).

Finally, the district court failed to engage with Frederick's argument that the prejudice resulting from counsel's failure to consult with and present an independent medical examiner bled into the sentencing stage because a reasonable probability exists that such witness would have created residual doubt. ROA 234 n.14. *See Lockhart v. McCree*, 476 U.S. 162, 181 (1986) (noting "residual doubts" by a jury during guilt phase are effective grounds for argument in capital-sentencing phase). Residual doubt is a powerful factor influencing juries to vote for less than death. Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L.Rev. 1538, 1563 (Oct. 1998). This Court has recognized the role of residual doubt in the capital-sentencing phase. *See Harmon v. Sharp*, 936 F.3d 1044, 1083 (10th Cir. 2019).

### b.    Failures Related to the Testimony of Dr. Harrison.

Despite Rowan's first-stage theory, he failed to inquire on cross-examination whether Harrison had an opinion regarding the cause of Ms. Frederick's closed-head

injury. Tr.V 1135-42. Further, Rowan failed to exploit Harrison's reliance on mistaken information provided by M.E. investigator Jodi Bowles to classify Ms. Frederick's manner of death as homicide. Evid.Hr.II 278. Specifically, on page two of Harrison's autopsy report, he noted from the investigator's narrative: "This 85 year old black female was reported to have been assaulted with an apparent brick by her son (as witnessed by the decedent's granddaughter)." Evid.Hr. St.Ex. 4; Evid.Hr. Def.Ex. 3. This information was inaccurate and contrary to the evidence at trial: Diggs did *not* witness the event that caused her grandmother's head injury. She was at her neighbor's house calling 911 at the time. Tr.IV 835-36. Despite this egregious misstatement in Harrison's autopsy report, Rowan failed to follow up on it in his cross-examination. Tr.V 1135-42.

Rowan's failure to exploit Harrison's reliance on mistaken information was likely due, in part, to his failure to obtain discovery from the M.E.'s Office requested by prior trial counsel, Hammarsten. Just prior to her removal as Frederick's counsel, Hammarsten filed a discovery request for the M.E.'s files. O.R. 281-83. She specifically requested "anything . . . that differs with conclusions reached by the OCPD, [because] such information is potentially exculpatory material that must be made available to the defense." O.R. 282. She also requested "the form OCME in possession of the Medical Examiner." O.R. 282. The State responded it was unaware what Hammarsten meant by the term "form OCME."[14] O.R. 630. Despite that

---

[14]The OCME form to which Hammarsten referred is "the back of the cover sheet that notes what the ME was told about the homicide b4 [sic] he/she began the autopsy." APCR Att. 24. OCCA referred to this form, which is Evid.Hr. Def.Ex. 3, as the "Investigator's Narrative." ROA 336.

Hammarsten's discovery motion remained unresolved, Rowan announced during a pretrial hearing: "I think that most of the discovery matters have been taken care of. There's an extensive file in my office." M.Tr. 7/29/14 at 4.

Finally, Rowan failed to object to a flagrant misstatement of the evidence by the State during closing arguments that Harrison opined Ms. Frederick's injuries were not consistent with a fall. Tr.VI 1228. This was a gross mischaracterization of Harrison's testimony because he was never asked such question.

### i.    Counsel Performed Deficiently.

OCCA made no performance-prong determination; nor did the district court. ROA 632. Therefore, *de novo* review applies. *See Rompilla*, 545 U.S. at 390. For argument regarding the proper measure of attorney performance, see *supra* at 13 & n.8.

Counsel's failure to cross-examine Harrison regarding the manner and cause of death, to correct Harrison's mistaken belief that Diggs witnessed Frederick assault Ms. Frederick with a brick, to obtain the requested discovery from the M.E.'s Office, and to correct the State's misrepresentation of Harrison's testimony during closing argument all stemmed from a lack of preparation and investigation rather than strategy. *See Wiggins*, 539 U.S. at 527-28; ROA 372, ¶ 3 (Rowan admitting he did not interview Harrison); Evid.Hr.I 192 (same), 195-200 (Rowan admitting he usually requests the Investigator's Narrative in all capital cases and was aware Hammarsten requested it, yet he never obtained it in this case);   Evid.Hr.II 414-19 (Walker admitting she had no strategic reason for failing to meet with Harrison; was generally familiar with M.E's Office's use of Investigators' Narratives and "missed" that

24

Investigator's Narrative was never turned over by the State in response to discovery request; and made no strategic decision not to present such evidence).

In a case where the defense theory ostensibly challenged the State's manner and cause of death, reasonable performance necessarily encompasses any opportunity to exploit obvious weaknesses and inaccuracies in the State's evidence regarding the same. Counsel's failure to do so here fell below constitutional standards.

### ii. The District Court Erred by Endorsing OCCA's Prejudice Determination.

Had Rowan cross-examined Harrison regarding the manner and cause of Ms. Frederick's death, corrected Harrison's misinformed belief that Diggs witnessed the alleged assault on Ms. Frederick, obtained the Investigator's Narrative, and objected to and corrected the State's misrepresentation of Harrison's testimony during closing argument, there exists a reasonable probability Frederick would have been acquitted of first-degree murder. Frederick was prejudiced by direct-appeal counsel's failure to raise these arguments because there exists a substantial likelihood the result of the direct appeal would have been different. OCCA's finding of no prejudice was an unreasonable application of *Strickland* and contrary to its progeny. § 2254(d)(1). Further, it was based on unreasonable determinations of fact. § 2254(d)(2).

First, OCCA's finding that Harrison's "opinion on the manner of death was not dependent on the [inaccurate] information in the Investigator's Narrative,"[15] ROA

---

[15]OCCA also found "Harrison testified at the Evidentiary Hearing that his determination of the manner of death . . . as a homicide was based upon several factors, *including* his examination of the body during the autopsy, police reports, *Investigator's Narrative* and any supplemental reports." ROA 337 (emphasis added).

338, is belied by the record. Evid.Hr.II 278 (admitting inaccurate information from Investigator's Narrative, which he integrated into his autopsy report, factored into his decision to rule the death a homicide); Evid.Hr.II 293 (stating he received inaccurate Investigator's Narrative prior to conducting autopsy); Evid.Hr.II 297 (stating he typically makes a point of looking at Investigator's Narratives before conducting autopsy); Evid.Hr.II 298 (agreeing manner of death would have been difficult to determine if Ms. Frederick had been discovered lying on the floor alone, with the same injuries, and there was no other evidence); Evid.Hr.II 303 (admitting inaccurate Investigator's Narrative "certainly . . . weigh[ed] very heavily along with the other information that [he] received" in concluding manner of death was homicide). Any conclusion Harrison's opinion regarding the manner of death wasn't dependent on the Investigator's Narrative was unreasonable.

Second, in finding that "regardless of any incorrect information in the Investigator's Narrative, [Harrison's] opinion that the death was a homicide would not have changed," ROA 338, the OCCA unreasonably failed to consider the entire record, which resulted in an unreasonable application of *Strickland*. *See supra* at 16-17 (discussion of *Strickland*'s requirement to consider totality of evidence in a prejudice analysis). Throughout his testimony at the evidentiary hearing, Harrison equivocated about the manner of Ms. Frederick's death. Evid.Hr.II 281 (admitting he couldn't rule out accidental fall as cause of Ms. Frederick's closed-head injury based

---

This statement cannot reasonably be reconciled with a finding that Harrison's opinion as to manner of death was not dependent on the inaccurate Investigator's Narrative.

on examination of her body); Evid.Hr.II 282 (admitting he couldn't rule out a fall associated with a medical condition such as a TIA as cause of the injury). OCCA unreasonably ignored the entirety of Harrison's testimony in finding his opinion about Ms. Frederick's manner of death would not have been different absent the Investigator's Narrative.

Also, OCCA's no-prejudice finding was an unreasonable application of *Strickland* and contrary to its progeny. *Strickland*, 466 U.S. at 696. Considering the many weaknesses in the State's case, had counsel adequately cross-examined Harrison regarding Ms. Frederick's cause and manner of death and the role of the inaccurate Investigator's Narrative, as well as objected to the State's improper closing argument, there exists a reasonable probability Frederick would have been acquitted of first-degree murder. If appellate counsel had raised these issues, there is a reasonable probability OCCA would have found trial IAC. *Neill,* 278 F.3d at 1057. In a case where the defense theory was that the alleged victim's injuries were caused by a fall, nothing could have been more important than evidence undermining the M.E.'s opinion as to the manner/cause of death. *See, e.g., Gersten*, 426 F.3d at 613-14.

With respect to the prejudice flowing from counsel's failures surrounding the testimony of Harrison, the district court determined OCCA's no-prejudice finding was not unreasonable. ROA 634-36.

> Given the evidence at trial and the additional evidence presented at the evidentiary hearing, the Court cannot conclude that that [sic] the OCCA applied *Strickland* in an objectively unreasonable manner when it concluded that Petitioner did not suffer prejudice from appellate counsel's omission of an ineffectiveness claim related to trial counsel's

27

cross-examination of Dr. Harrison. Petitioner is not entitled to relief on this claim.

ROA 635-36. The district court erred for the following reasons:

First, addressing Frederick's argument that OCCA unreasonably found Harrison's opinion on manner of death was not dependent on the inaccurate information in the Investigator's Narrative, the district court found: "If Dr. Harrison's opinion would have been the same even without the inaccurate information, it is certainly not unreasonable for the OCCA to conclude that his opinion was not dependent on the information." ROA 633. The district court and OCCA failed to consider the *jury never heard* Harrison's later admissions at the evidentiary hearing that the inaccurate Investigator's Narrative "certainly . . . weigh[ed] very heavily along with the other information that [he] received" in concluding the manner of death was homicide. Evid.Hr.II 303. *See also* Evid.Hr.II 278 (admitting inaccurate Investigator's Narrative factored into his decision to rule the death a homicide); Evid.Hr.II 293 (admitting he received inaccurate Investigator's Narrative before conducting Ms. Frederick's autopsy); Evid.Hr.II 298 (admitting manner of death would have been difficult to determine if Ms. Frederick had been discovered lying on the floor with the same injuries and there was no other evidence).

Although Harrison, after much equivocating, testified he stood by his original findings, his critical admissions about his reliance on the inaccurate information at the evidentiary hearing are compelling. Because of the many vulnerabilities in the State's case, there is a reasonable probability the jury would have acquitted Frederick had it been aware the inaccurate Investigator's Narrative "weigh[ed] very heavily"

28

in Harrison's decision to classify Ms. Frederick's death as a homicide.

Second, the district court's determination that OCCA's no-prejudice finding with respect to counsel's failures to adequately cross-examine Harrison and object to the prosecutor's misstatement of Harrison's testimony was a reasonable application of *Strickland* is erroneous. At the evidentiary hearing, Harrison conceded he couldn't rule out an accidental fall as the cause of Ms. Frederick's head injuries based on his examination of her body. Evid.Hr.II 281-82. He also admitted he would expect a victim who had been struck in the head with a brick to have external bleeding. Evid.Hr.II 285. Such admissions would have been powerful in conjunction with attending paramedic Simmons's trial testimony that Ms. Frederick had no lacerations or bleeding to her face. Tr.V 997-98. Had Rowan adequately cross-examined Harrison and corrected the prosecutor's misstatement about Harrison's testimony, there exists a reasonable probability Frederick would have been acquitted, especially in light of the additional testimony Bux could have provided.

Finally, the district court failed to engage with Frederick's argument that the prejudice resulting from counsel's failures with respect to Harrison bled into the sentencing stage because a reasonable probability exists that a reasonably effective cross-examination of Harrison and a correction of the prosecutor's misstatement of Harrison's testimony in closing would have created residual doubt. *See supra* at 22 (discussing residual doubt).

### 2. Failure to Adequately Investigate, Develop, and Present Mitigating Evidence in Sentencing Stage.

Rowan presented almost no mitigation, including no live witnesses. A

reasonable investigation into Frederick's background would have uncovered evidence that he had a traumatic childhood, including physical abuse by his parents; that he had positive attributes and a family who loved him and did not want him to be executed; that he had become institutionalized after a lifetime of incarceration; and that he had brain damage.

The Supreme Court has emphasized counsel's failure to conduct a reasonable mitigation investigation is deficient performance. *See Sears v. Upton*, 561 U.S. 945, 951-52 (2010); *Porter v. McCollum*, 558 U.S. 30, 39-40 (2009); *Rompilla*, 545 U.S. at 383-90 (2005); *Wiggins*, 539 U.S. at 527-28; *Williams*, 529 U.S. at 395-96. "To perform adequately in a capital case, trial counsel must undertake 'to discover *all reasonably available* mitigating evidence . . . .'" *Anderson v. Sirmons*, 476 F.3d 1131, 1142 (10th Cir. 2007) (quoting *Wiggins*, 539 U.S. at 524). This Court is "compelled to insure the sentencing jury makes an individualized decision while equipped with the 'fullest information possible concerning the defendant's life and characteristics,' and must scrutinize carefully any decision by counsel which deprives a capital defendant of all mitigation evidence." *Mayes v. Gibson*, 210 F.3d 1284, 1288 (10th Cir. 2000) (quoting *Lockett v. Ohio*, 438 U.S. 586, 603 (1978)). Here, counsel had no reasonable basis for failing to thoroughly investigate and present key areas of Frederick's mitigation case.

### a.    The Mitigation Evidence Defense Counsel Presented.

After the State presented 14 witnesses in support of its alleged aggravators, the entirety of the mitigation evidence presented was a short portion of a 1982 post-conviction hearing transcript containing the testimony of Frederick's deceased father,

Nathan Frederick, Sr. ("Frederick, Sr."), read aloud by an investigator. Tr.VIII 1496-1514. The hearing was related to Darrell Frederick's 1972 robbery prosecution. Tr.VIII 1497.

Frederick, Sr.'s testimony included that in 1972, at 15 or 16 years old, Darrell was "very immature in many things. . . . For instance, understanding his thinking." Tr.VIII 1498. Darrell was in "an accident in the truck, ran into a post . . . and hit his head on the windshield, busted the windshield out of the truck and . . . was a changed child from that very moment." Tr.VIII 1498. Darrell was "just very easygoing. . . . And all that changed after . . . that accident." Tr.VIII 1499. Darrell was "slow." Tr.VIII 1498. According to Frederick, Sr., Darrell "came up in the church" and had "led a pretty sheltered life." Tr.VIII 1497, 1507. Darrell "ran away from home" at 14 years old because he was "immature" and "[felt] that he's able to take care of himself." Tr.VIII 1501, 1506.

Based solely on this testimony, the defense presented five mitigating circumstances for the jury's consideration: 1) Frederick had an accident in a truck and hit his head on the windshield and "was a changed child from that very moment"; 2) Frederick's "break with his father which led to him leaving home at the age of fourteen had a negative impact on his development"; 3) Frederick "has become institutionalized which has caused him to become suspicious of other people and overly aggressive"; 4) Frederick "has never learned to live as a free man and is unable to cope with the stress and strain of society"; and 5) Frederick, Sr. "never took an

interest in Darrell after Darrell left home at the age of fourteen."[16] O.R. 927.

Having presented "only the most skeletal case in mitigation," *Anderson*, 476 F.3d at 1145, Rowan resorted to telling the jury in sentencing-stage closing, "[W]e tried hard to find an explanation. Something that would explain [Frederick's] violent behavior and his violent episodes . . . . That's not normal." Tr.VIII 1582. Had Rowan "tried hard to find an explanation," he could have presented a compelling mitigation case, instead of the "sort of 'halfhearted mitigation case' derided by the Supreme Court in *Wiggins*." *Smith* (*Roderick*) *v. Mullin*, 379 F.3d 919, 944 (10th Cir. 2004) (citation omitted).

### b.    The Evidence Defense Counsel Did Not Present.[17]

### i.    Evidence from Family Witnesses.

### a.    Abuse and Dysfunction in the Frederick Home.

Post-conviction counsel discovered and presented information revealed by Frederick's siblings and public documents, which painted a much different picture of the Frederick home from the "sheltered life" presented to the jury. Tr.VIII 1507.

Jerome Frederick ("Jerome"), Darrell Frederick's brother who is four years younger, Evid.Hr.I 116, testified at the evidentiary hearing that he and Darrell grew up in a "stern," religious household where the only sanctioned activities were work

---

[16]The jury heard no evidence to support the third and fourth alleged mitigators.

[17]Habeas counsel discovered other witnesses who provided confirming evidence to supplement the sentencing-stage IAC claim presented on post-conviction. *See* ROA 376-97; *Mosley v. Atchison*, 689 F.3d 838, 842 (7th Cir. 2012) (finding *Cullen v. Pinholster*, 563 U.S. 170 (2011) "does not confine a district court's decision on [the] ultimate question under § 2254(a) to a limited state court record").

and church, Evid.Hr.I 118, 141. Their father was a minister of the Bethel Apostolic Pentecostal Holiness Church, was a mechanic, and owned a service station. Evid.Hr.I 117. He forced Darrell and his older brother, Arthur "Jimmy" Ross, to work at the service station "while other kids were doing kid things." Evid.Hr.I 117-18. He did not allow participation in school activities like football games, dances, and the school band because he considered them to be sins. Evid.Hr.I 117-19. He also considered holiday celebrations, birthday presents and parties, and television to be sins. Evid.Hr.I 118-19.

Frederick, Sr. enforced his strict rules with violence. He beat Jerome and Darrell with rubber heater hoses and extension cords if he believed they had been "disobedient" or untruthful.  Evid.Hr.I 124-25. Examples of disobedience included going down the block to play with other children and attending a school function – "anything that went against the church rules." Evid.Hr.I 125. Usually, when one child was getting punished, all the children had to watch. Evid.Hr.I 125. Jerome and Darrell were sometimes blamed and punished for another sibling's actions. Evid.Hr.I 125-26. The abuse in the Frederick house was not limited to the beatings inflicted by Frederick, Sr. Jerome also testified that he got "a spanking from [his mother] practically every day." Evid.Hr.I126. Darrell "g[o]t spankings" from her as well. Evid.Hr.I 126. She inflicted these "spankings" with an extension cord. Evid.Hr.I 126.

Frederick's older brother, Jimmy Ross, didn't testify at the hearing and declined to provide an affidavit, but informed post-conviction investigator, Laura Giblin, that Frederick, Sr. beat Ms. Frederick in front of him and Darrell on multiple occasions and beat the older children, including Darrell, with a hose. APCR Att. 33.

33

At the same time Frederick, Sr. imposed strict rules and enforced them with beatings, he was having extramarital affairs and fathering children outside his marriage. Jerome testified that in addition to having two children from his first marriage, his father had children during his marriage with Ms. Frederick "by at least two other young ladies." Evid.Hr.I 121. Jerome learned about his siblings when he "c[a]me home one day, they were in . . . our bed asleep." Evid.Hr.I 121. He asked his father who these children were, and his father told him they were his brothers and sisters.[18] Evid.Hr.I 122.

Jerome testified his father was accused of having "relationship[s]" with female members of the church he pastored; a young relative accused his father of inappropriate sexual behavior; the church's governing body attempted to remove his father as pastor; and his mother filed for divorce and sought a protective order against his father. Evid.Hr.I 123. This testimony is supported by publicly available documents located on post-conviction.

In 1996, Connie Frederick filed a petition for protective order against Frederick, Sr.:

> Defendant's pregnant niece moved into Plaintiff's house. When Plaintiff tries to correct niece Defendant gets angry at Plaintiff and beats her. Defendant also makes Plaintiff watch the other children in the house while he has sex with his niece. He also makes the Plaintiff watch him

---

[18]Jerome and Darrell were two of 13 siblings total. Tr.IV 807, 909. Five – Darrell, Jerome, Karen, Judy, and Tobias – were the children of both Frederick, Sr. and Connie Frederick. Tr.IV 932. Jimmy Ross was Ms. Frederick's son from a previous relationship. Tr.IV 807, 932. Frederick, Sr. had two children from a previous marriage and five children with other women during his marriage to Ms. Frederick. Tr.IV 910; Evid.Hr.I 121.

> have sex with his niece. When she confronts him about it he beats her.
> Plaintiff fears for her life. Defendant also takes Plaintiff's social security
> check and cashes it and keeps the money.

APCR Att. 34. Frederick, Sr. objected, stating the allegations were false and Ms.
Frederick wasn't taking her "required medication," rendering her "unruly" and unable
to "control her behavior." APCR Att. 35. *See also* APCR Att. 36 (divorce case
docket).

As explained in an article in Oklahoma City's Black Chronicle newspaper, after
investigating allegations against Frederick, Sr., the Board of Bishops of the Churches
of the Apostolic Faith Association defrocked him in 1997 after a church member,
"Clark Gates Sr., formally charged Bishop Frederick with molesting his then 14-year-
old daughter (Bishop Frederick's niece) on numerous occasions."[19] APCR Att. 37
(ROA 375). After a restraining order was issued against Frederick, Sr., "[o]n the
following Sunday, Mr. Gates and about 120 other members of Bethel Apostolic
arrived at the church with the intention of 'presenting charges against Bishop
Frederick.'" ROA 375. During the Board's investigation, Frederick, Sr. "conceded
that he had molested 'all the women' in the church he pastors." ROA 375. After
deciding "unanimous[ly]" to "disfellowship[] and defrock[] Bishop Nathan
Frederick," the Board issued a statement:

> This decision is based upon the confession of Bishop Frederick for . . .
> engaging in an incestuous relationship with a minor, malfeasance in
> office, behavior unbecoming a bishop, sleeping with women other than

---

[19]Giblin obtained an Oklahoma City Police Department report regarding lewd acts
with a child, which has the victim's and suspect's names redacted but lists the
Fredericks' home address and says the victim reported the crime June 5, 1997. APCR
Att. 38.

his wife and corrupting a minor. . . . Bishop Frederick [is] not . . .
permitted to preach in any church that is a member of the Churches of
the Apostolic Faith.

ROA 375. However, "Bishop Frederick . . . not only continued to conduct worship

services at Bethel Apostolic, but made contact by telephone with the girl he [wa]s

accused of molesting"; this telephone contact occurred "[a]t about 4 a.m." one

morning.[20] ROA 375.

Jerome Frederick testified that Darrell crashed his father's truck into "the gas

pumps" at their father's service station when Darrell was 14 or 15. Evid.Hr.I 120,

148-49. This was "a pretty bad accident" and Darrell was "just different" afterward.

Evid.Hr.I 120. "[H]e was a little bit more distan[t] . . . A little bit more to himself."

Evid.Hr.I 120. Darrell's disagreements with their father increased after this accident.

Evid.Hr.I 120. Their relationship reached a breaking point one night when Darrell

was 14 or 15. Evid.Hr.I 143-44. Darrell's father came home from church to find

Darrell in bed, accused him of having liquor on his breath, and said he was going to

"whoop" him. Evid.Hr.I 128. When Darrell told his father he "wasn't gonna take no

more whoopins," his father punched him in the face and knocked him out. Evid.Hr.I

128. Darrell left home after this incident. Not long afterward (around 1970), he was

placed in a boys' home, and then went to prison. Evid.Hr.I 128-29, 139. Jerome also

left home around 14 or 15 to escape the abuse. Evid.Hr.I 129. Jerome did not see

---

[20]Frederick, Sr. sued The Black Chronicle for libel in Oklahoma County District
Court Case No. CJ-1997-8460. Oklahoma State Courts Network,
https://www.oscn.net/dockets/GetCaseInformation.aspx?db=oklahoma&number=CJ-
1997-8460&cmid=743820 (last visited Oct. 18, 2021). In 1999, a jury unanimously
returned a verdict in favor of The Black Chronicle. *Id.*

Darrell Frederick again until Frederick was released from prison in 2002. Evid.Hr.I 130-31.

Because counsel failed to interview family members and obtain publicly available records, the jury heard a false narrative of Frederick's "sheltered" life. Tr.VIII 1507. In his sentencing-stage opening statement, Rowan told the jury, "Nathan and Connie tried to put kind of a little bubble around the family. . . . The world's an evil place . . . ." Tr.VII 1294. The jury didn't hear the truth about Darrell's troubled home life as a child. It heard no evidence to explain why Darrell left home at such an early age and began a life of recurrent incarceration and allegations of violence.

### b.    Positive Evidence.

The State portrayed Frederick as a violent predator with no redeeming qualities, and even Rowan referred to him as an "ogre." Tr.V 1144. Rowan failed to present family members to say anything positive about him. Aside from Frederick, Sr.'s testimony, the only sentencing-stage evidence from Frederick's family came during the State's aggravation case, when Frederick's sister, Karen Frederick; his brother, Sgt. Frederick; and his niece, Da'Jon Diggs, testified about his history of violence, Tr.VII 1391-1419; Tr.VIII 1430-39, and Karen and Sgt. Frederick; Diggs; and Judith Frederick-Jones, Frederick's youngest sister, gave victim impact statements, Tr.VIII 1481-93. After hearing the family's testimony, the jury was left with the impression no relatives had anything nice to say about him or cared whether he died. Counsel mistakenly assumed every family member at trial was there to support the State. ROA 373, ¶ 5; Evid.Hr.I 233. Counsel reinforced this inference

during the sentencing-stage closing: "His family . . . are angry with him. Probably if they were asked they would tell you that they want him to die." Tr.VIII 1578. *See also* Tr.VIII 1588-89.

Unlike trial and appellate counsel, post-conviction counsel interviewed and presented the testimony of several family members who love Frederick, opposed a death sentence, and would have testified about his positive attributes. Some of them were even in court during the trial. APCR Atts. 29-31; Evid.Hr.I 81-82, 99-100, 111. Five family members – Renita Long, LaTrena Sloan, Johnita Cole, Latisha Miller, and Jerome Frederick – provided evidence that in the few years preceding Ms. Frederick's death, Frederick served as her primary caregiver. He provided his mother with daily assistance in routine tasks and did so without complaining. APCR Att. 30; Evid.Hr.I 65-66, 74-77, 80, 87-88, 94-97, 133-34. These witnesses also described his other positive qualities and their love for him.

Renita Long, Ms. Frederick's second cousin, didn't testify at the evidentiary hearing, but submitted a post-conviction affidavit. APCR Att. 30. She and Darrell "became very close" and she "considered Darrell to be more like an uncle to me and my children." *Id.*:

> He would spend a lot of time at the home I shared with my sister and children. We came to rely on Darrell in many ways. I did not have a car and many days Darrell would walk to the store to get groceries for my family. He would often spend the night at our home and cared for our children. Darrell would walk from Connie's home on NE 34th St. to our home on NE 13th to check on us and then he would walk back to make sure his mother had a good meal. I describe Darrell as a sweetheart who would do anything for anyone. He loves his family very much.

*Id.* Long explained Darrell and Ms. Frederick had a "good relationship" and "[h]e

took very good care of her." *Id.* Long "never saw them argue or heard Darrell have any arguments with anyone in the family." *Id.* She "went to court whenever [her] work schedule allowed" and "there were many family members at the trial who supported Darrell." *Id.* She "love[d] Darrell and did not want him to receive the death penalty." *Id.*

Sloan, Cole, and Miller all testified at the evidentiary hearing. They testified Frederick was a loving person who cared for his mother. Evid.Hr.I 65, 68, 79-80, 94, 100. They provided examples from their observations of Frederick interacting with his mother while they were present in the Frederick home. Evid.Hr.I 65-66, 74, 80-81, 94.

Sloan, Frederick's second cousin, was present during at least part of the sentencing phase of trial and explained "it was hurtful and confusing" to hear only negative things said about him. Evid.Hr.I 81-82. She saw him at family members' homes and family functions. Evid.Hr.I 85. She described him as "[v]ery loving, . . . very happy, soft spoken," Evid.Hr.I 79, and testified about a time, a week before the alleged homicide, when she saw Frederick give his own breakfast to his mother after she had eaten the first breakfast he had made her, Evid.Hr.I 80-81. This was typical of how he was around her. Evid.Hr.I 81. Sloan would have asked the jury to spare Frederick's life. Evid.Hr.I 82.

Cole, Frederick's aunt, testified she and "[her] side of the family" were at the trial to support Frederick. Evid.Hr.I 99-100. It made her feel "[b]ad" that the jury only heard negative things about Frederick because "he always try [sic] to help his family." Evid.Hr.I 100.  While Frederick is in prison, she "writes him and send[s] pictures."

39

Evid.Hr.I 97. He is "always concerned" about her and her "fifth generation" of grandchildren in her care. Evid.Hr.I 96. She loves him, Evid.Hr.I 96, and would have asked the jury to spare his life, Evid.Hr.I 100-01.

Miller, Frederick's second cousin, APCR Att. 28, testified she and Frederick are "real tight"; he is "like a brother to me," Evid.Hr.I 64. Frederick "just love [sic] his whole entire family, period" and is a "loving person." Evid.Hr.I 68. He shared food stamps with Miller and her children. Evid.Hr.I 77. She had "never seen Darrell lose his temper or have an argument." Evid.Hr.I 72. She loves Frederick and would have asked the jury to spare his life. Evid.Hr.I 78.

Finally, Jerome testified Frederick had a good relationship with his mother, was overprotective of her, and was a good caregiver to her. Evid.Hr.I 133. He testified, "I've observed about Darrell, he's not the type of person that would start trouble. He'll try to avoid." Evid.Hr.I 157. He testified he loves Frederick and "[n]othing can change my mind about that," Frederick's life has value to him, and he would have asked the jury to spare Frederick's life. Evid.Hr.I 135-36, 176. He testified regardless of what Frederick has done, he doesn't believe Frederick should be punished by the State taking his life. Evid.Hr.I 176.

Because Rowan failed to conduct a minimal investigation into Frederick's background, the jury remained unaware of Frederick's many positive acts and attributes and several family members' love for him and desire to see him live.

### c.  Failure to Investigate.

Rowan failed to investigate the evidence Frederick's family could have provided. The sentencing-stage witness list Hammarsten filed the day before Rowan

replaced her should have put Rowan on notice that supportive testimony from the family was readily available. This document listed two family members, Johnita Cole and Latisha Miller (formerly Long), and summarized their proposed positive testimony about Frederick. O.R. 604-05.

In addition to Cole and Miller, post-conviction counsel located four other supportive witnesses: Sloan, Long, Jerome, and Ross. Trial counsel did not interview these witnesses. Evid.Hr.I 81, 135-36; APCR Atts. 30, 33. Three of the family witnesses – Cole, Sloan, and Long – were at Frederick's trial. APCR Atts. 29-31; Evid.Hr.I 81-82, 99-100, 111.

Hammarsten testified at the evidentiary hearing that in preparing Frederick's case, she "was interviewing any family I could find." Evid.Hr.III 571. She interviewed Cole and Miller, twice each, prior to placing them on Frederick's witness list. Evid.Hr.III 592-94. She believed they would have made "good," "viable witnesses" and their testimony would have been "powerful mitigation evidence." Evid.Hr.III 592-93, 630-31. Hammarsten "assumed they were going to be called" and didn't learn until after Frederick's trial that Rowan had not presented their testimony. Evid.Hr.III 608.

Rowan testified when he received Frederick's case from Hammarsten, it looked "thoroughly investigated" and he "thought everything had been done pretty much." Evid.Hr.I 189. He "d[id] not recall personally speaking to any of Mr. Frederick's family prior to his trial." ROA 373, ¶ 5. Rowan "may have had a brief conversation with Tobias [Sgt. Frederick]," but he did not recall "any conversations with any other family members." Evid.Hr.I 205. Rowan saw Frederick's family in the courtroom

during trial, but didn't speak to them because "looking out at the sea of faces at the trial I just saw no happy faces that were ready to jump forward and testify for Darrell. And so I assume they all felt that way." Evid.Hr.I 205-06, 233. He admitted "I would've started talking to them when I first got on the case if I knew they were supportive." Evid.Hr.I 206. Rowan acknowledged Hammarsten had filed a sentencing-stage witness list naming four witnesses, O.R. 604-05; he admitted he didn't interview any of them. Evid.Hr.I 206. When asked if he was "aware Ms. Hammarsten had approached two family members," Rowan testified, "I am now more than I was then." Evid.Hr.I 234. When asked if he "considered putting them on and just decided not to for strategic reasons," Rowan answered, "No, I blew them off completely" because "I had not gone through the work and preparation to integrate them into a [sic] overall theme for saving Darrell's life." Evid.Hr.I 238-39. When asked, "Did you have a strategic reason for not interviewing the Frederick family members?", Rowan replied, "No." Evid.Hr.I 206.

Like Rowan, appellate counsel Walker[21] didn't attempt to interview any of Frederick's family members. Evid.Hr.II 419. She based this decision on conversations with Rowan, who told her Frederick's family members didn't want to testify and "mean mugged" Frederick and the defense team during the trial. Evid.Hr.II 422-23. She had since read the post-conviction affidavits, and explained why she believed this information would have been persuasive mitigation. Evid.Hr.II 419-22; Evid.Hr.III 462-64. Had Walker discovered the evidence from the family during the appeal, she

---

[21]Before Frederick's, Walker's only filed appeals were two revocation appeals. Evid.Hr.II 388.

would have presented it to support an IAC claim. Evid.Hr.II 422.

### d. The District Court Erred by Endorsing OCCA's Performance and Prejudice Determinations.

### i. Performance.

On post-conviction, OCCA addressed this claim's merits. Citing *Strickland*, OCCA found counsel did not provide IAC. ROA 352-56. OCCA's finding that counsel didn't perform deficiently was an unreasonable application of *Strickland* and contrary to *Strickland*'s progeny, including *Wiggins*, *Porter*, *Williams*, *Rompilla*, and *Sears*. 28 U.S.C. § 2254(d)(1). OCCA's finding of no deficient performance was also based on unreasonable determinations of fact. § 2254(d)(2).

OCCA unreasonably determined Rowan's performance wasn't deficient because his testimony showed he "had strategic reasons for not calling Petitioner's family members." ROA 353. This was legally and factually unreasonable. In *Strickland*, the Court held "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691.This Court should "focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [Frederick's] background *was itself reasonable*." *Wiggins*, 539 U.S. at 523. Frederick's "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." *Id.* at 527-28. Over approximately 11 months, Rowan failed to interview Frederick's family members. Even though some supportive family members were listed on Hammarsten's witness list, Rowan "blew them off completely." Evid.Hr.I 238-39. As in *Wiggins*, OCCA's

"deference to counsel's strategic decision," "despite the fact that counsel based this alleged choice on . . . an unreasonable investigation, was . . . objectively unreasonable." 539 U.S. at 528.

"[U]nder the prevailing professional norms at the time of [Frederick's] trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'" *Porter*, 558 U.S. at 39 (quoting *Williams*, 529 U.S. at 396). In *Porter*, "counsel did not even take the first step of interviewing witnesses or requesting records. . . . Beyond that, . . . he ignored pertinent avenues for investigation of which he should have been aware." *Id.* at 39-40. The same is true here. The district court found, "[Rowan] had access to Ms. Hammarsten's entire file, including notes from meetings and information about which family members the defense team was still trying to locate. . . . Mr. Rowan did not interview either of the witnesses listed by Ms. Hammarsten . . . ." ROA 639-40 (citations omitted). Instead of pursuing these leads, Rowan "ignored pertinent avenues for investigation." *Porter*, 558 U.S. at 40.

OCCA's finding that Rowan's testimony showed he "had strategic reasons for not calling Petitioner's family members" was also factually unreasonable. ROA 353. On the contrary, Rowan's testimony (as laid out above) made clear he did not make a strategic decision. *See supra* at 41-42.

The district court acknowledged that Rowan's testimony regarding his failure to investigate and present the evidence from the family witnesses was "troubling." ROA 644. Despite this, the court found, "Although Mr. Rowan may subjectively believe . . . that he 'blew it,' the OCCA's conclusion that other testimony at the evidentiary hearing showed he did have strategic reasons for not calling family

44

members to the stand is not so unreasonable that there is no room for fairminded disagreement." ROA 644-45. On the contrary, OCCA's finding that "Rowan's self-deprecating claim [that he "just blew it"] was not supported by other testimony from the Evidentiary Hearing" was an unreasonable factual determination. ROA 347.

OCCA explained "Hammarsten testified that she remembered Mr. Rowan had a reason for not presenting the two witnesses she designated, but she could not remember the reason . . . ." ROA 347-48. However, Hammarsten testified she "d[id]n't even remember" if it was a legal reason, and she ultimately testified, "*I'm assuming* there was something in his mind that made him decide not to." Evid.Hr.III 608-09 (emphasis added). Furthermore, this testimony by Hammarsten was only about Rowan's failure to present the two witnesses designated on her witness list; it didn't explain Rowan's failure to interview other family members. Hammarsten testified that because Rowan "had my file," "[h]e would've been able to see who . . . we were still looking for." Evid.Hr.III 606.

OCCA also explained "Walker testified that Mr. Rowan told her that family members did not want to help Petitioner." ROA 348. It is true that at the hearing, Walker testified Rowan believed the family did not want to testify and "mean mugged" Frederick and his team at the trial; however, Walker believed the trial would have been too late for Rowan to decide to call the family as witnesses. Evid.Hr.II 422-23. "[T]he witnesses that were listed on the witness list should've been interviewed and determined . . . what they were going to say, not just looking in the audience and thinking that the family was mean mugging you." Evid.Hr.III 486. When asked if she would have taken a different mitigation strategy from Rowan's, she testified, "I don't

think there was really a strategy at all." Evid.Hr.III 462.

The district court found:

In making tactical judgments about how to proceed in the case, Mr. Rowan was entitled to rely on the investigative work performed by prior counsel . . . . [I]t would have been reasonable for Mr. Rowan to decide that spending additional time and resources tracking down the missing family members would not have been productive. . . . OCCA's conclusion that trial counsel was not ineffective for failing to locate additional family members is not unreasonable.

ROA 641-42 (internal citations omitted). First, even if "it would have been reasonable for Mr. Rowan to decide that spending additional time and resources tracking down the missing family members would not have been productive," that isn't what happened. In *Richter*, the Supreme Court held "courts may not indulge '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions." 562 U.S. at 109 (citation omitted). Rowan testified he had no strategic reason for failing to interview family members. Evid.Hr.I 206, 235.

Even if Rowan had "decide[d] that spending additional time and resources tracking down the missing family members would not have been productive," ROA 641-42, such a decision would not have been reasonable. The district court erroneously endorsed OCCA's finding that "Ms. Hammarsten testified to 'an extensive investigation she and her staff conducted to locate family members.'" ROA 641(quoting ROA 346). From the record, it is impossible to conclude Hammarsten's investigation was "extensive." ROA 641. Although she testified she and her investigator were "doing all that [they] could" to locate potential family witnesses, she did not describe many details about the investigation, and those she did seem to recall were incorrect. For example, she could not remember how she located family

46

witnesses, Evid.Hr.III 591, which family witnesses she had looked for, Evid.Hr.III 595-96, the name of one of the two family witnesses she had put on the witness list,[22] Evid.Hr.III 592-93, or these witnesses' relationships to each other, Evid.Hr.III 592. The district court relied on generalities: "Hammarsten testified that she knocked on a number of doors, acquired available records, and did all she could to locate family members."[23] ROA 641.

Even if Rowan was aware of Hammarsten's investigation,[24] and even if it had been "extensive," during the 11 months of his representation, he never attempted to speak to the family Hammarsten was unable to locate. Hammarsten testified because Rowan "had my file," "[h]e would've been able to see who . . . we were still looking for." Evid.Hr.III 606. Below, Respondent appeared to concede that in 11 months, the only investigation Rowan conducted was "that he traveled to Tulsa to meet with Dr. Art Williams." ROA 501 n.37. Rowan presented no live witnesses in either stage of the trial. It wouldn't have been reasonable for him to "decide that spending additional time and resources tracking down the missing family members would not have been

---

[22]Out of all potential relatives, Hammarsten specifically testified to speaking with only three, and accurately named only one. *See* ROA 602 (citing Evid.Hr.III 544, 592, 595).

[23]OCCA and the district court found Hammarsten was not able to locate Jerome Frederick. ROA 346-47, 641 (citing Evid.Hr.III 595-97), 646 n.11. While Hammarsten testified she tried to locate two brothers, she couldn't remember if Jerome was one. Evid.Hr.III 595-96.

[24]When asked if he was "aware that Ms. Hammarsten had approached two family members," Rowan admitted, "I am now more than I was then." Evid.Hr.I 234.

productive."[25] ROA 641-42.

OCCA found "no indication [Frederick's family] did anything to make themselves available to testify at trial." ROA 353-54. This was legally and factually unreasonable. It is not witnesses' responsibility to make themselves available to testify. Instead, it's an attorney's responsibility to investigate his capital client's mitigation case, including interviewing witnesses familiar with his background. *See, e.g., Porter*, 558 U.S. at 39. The district court found that with this finding, "OCCA appears to be remarking on the difficulties counsel faced in locating witnesses, not blaming Petitioner's family." ROA 647. However, Rowan didn't attempt to locate family members, and it is clear several were available. Hammarsten interviewed Cole and Miller, twice each, prior to putting them on the witness list. Evid.Hr.III 592-94. Both said they would have testified but no one followed up with them regarding the trial date. Evid.Hr.I 68, 97-98. Long and Jerome also would have spoken to trial counsel and testified. APCR Att. 30; Evid.Hr.I 135-36. Cole, Long, and Sloan attended the trial. APCR Atts. 29-31; Evid.Hr.I 81-82, 99-100, 111.

OCCA found, "[D]espite Rowan's claim that he 'blew off family mitigation witnesses', he testified that Petitioner was not helpful in preparing a mitigation case as he felt he was innocent and that mitigation evidence was not necessary."[26] ROA

---

[25]The district court found Rowan "knew that many of Petitioner's siblings did not have a close relationship with him." ROA 642 (citing Evid.Hr.I 205). However, his siblings could have provided critical information about their childhood.

[26]Rowan continued, "[H]e never told me . . . not to put on any mitigation case." Evid.Hr.I 234. Rowan didn't "have any real memory of going into a very deep discussion" with Frederick about mitigation, and "wished that we had talked more

348. The *Porter* Court held: "Porter may have been fatalistic or uncooperative, but that does not obviate the need for defense counsel to conduct *some* sort of mitigation investigation." 558 U.S. at 40. *See also Rompilla*, 545 U.S. at 381 ("Rompilla's own contributions to any mitigation case were minimal," as "[c]ounsel found him uninterested in helping" and "even actively obstructive"); *Battenfield v. Gibson*, 236 F.3d 1215, 1233-34 (10th Cir. 2001).

OCCA unreasonably found, "Some of the family members [Hammarsten] located had no first-hand knowledge of Petitioner's interaction with the decedent and she was concerned that might blunt their impact with the jury." ROA 346. On the contrary, Hammarsten was not at all "concerned" about family members' lack of "first-hand knowledge." Instead, she made clear it was her understanding the family members had firsthand knowledge. Evid.Hr.III 594. She ultimately agreed that *if* she became aware, *in hindsight*, that they had no personal knowledge, this "might have" "blunted the impact of their testimony." Evid.Hr.III 595. As this was not a concern Hammarsten would have communicated to Rowan, it couldn't have contributed to any "strategic" decision by Rowan.

The district court found, "Although Ms. Hammarsten thought '[Cole and Miller] were good witnesses,' it would not have been unreasonable for Mr. Rowan to decide, based on the witness summaries filed by Ms. Hammarsten, that their testimony would not be helpful or credible." ROA 642-43 (citation omitted). The district court's *post hoc* rationalization contradicted the record, contrary to *Richter*.

about . . . what his background was," Evid.Hr.I 203, 234. "[I]t's my fault that I did not spend enough time with him . . . ." Evid.Hr.I 203.

562 U.S. at 109. Rowan indicated he hadn't been aware of the witnesses, nor did he "consider[] putting them on and . . . decide[] not to for strategic reasons." Evid.Hr.I 238-39. Even if Rowan had decided, based on the summaries of these witnesses' proposed testimony alone, that "their testimony would not be helpful or credible," ROA 642, this would have been unreasonable, as Hammarsten had met with them and deemed them "good witnesses." *See Wiggins*, 539 U.S. at 527-28.

OCCA found, "Even if Ms. Cole, Ms. Sloan and Ms. Miller would have been available to testify at trial, the majority of their testimony regarding Petitioner's conduct around the decedent was based on hearsay." ROA 354. This finding was factually unreasonable, but the district court erroneously endorsed it. ROA 642 n.10. Each of these witnesses provided examples from personal observations of Frederick interacting with his mother. Evid.Hr.I 65-66, 74, 80-81, 94. In particular, Miller testified from personal knowledge that Frederick took care of Ms. Frederick, grocery shopped for her, fed her, and cleaned the house. Evid.Hr.I 75-77. OCCA unreasonably failed to consider the helpful testimony Long would have provided, as laid out in her affidavit. APCR Att. 30. Finally, Cole, Sloan, Miller, and Long would have provided testimony about much more than "Petitioner's conduct around the decedent," ROA 354; each could have described his other positive attributes and would have asked the jury to spare his life.

OCCA's determination of no deficient performance based on this finding was an unreasonable application of *Strickland* and contrary to *Sears* and *Richter*. "[T]he fact that some of such evidence may have been 'hearsay' does not necessarily undermine its value – or its admissibility – for penalty phase purposes." *Sears*, 561

U.S. at 950. "[R]eliable hearsay evidence that is relevant to a capital defendant's mitigation defense should not be excluded by rote application of a state hearsay rule." *Id.* at n.6. *See Mayes*, 210 F.3d at 1288. Further, the Court "may not indulge '*post hoc* rationalization' for counsel's decisionmaking."[27] *Richter*, 562 U.S. at 109. The district court acknowledged "it may be reasonable to conclude, as Petitioner suggests, that Mr. Rowan could not have harbored concerns about the testimony being based on hearsay at the time he made his decision not to present family witnesses." ROA 642 n.10. As OCCA correctly noted, "'a fair assessment . . . requires that every effort be made . . . to evaluate the conduct from [Rowan's] perspective at the time.'" ROA 353(quoting *Strickland*, 466 U.S. at 689). Rowan's failure to investigate this evidence was not reasonable.

OCCA determined, "[E]ven if [Jerome Frederick] could have been located . . . electing not to call him as a witness was unquestionably sound trial strategy. While he may have offered evidence of Petitioner's turbulent childhood, he would also have been the source of evidence of Petitioner's violent, criminal past." ROA 354. Although this was legally and factually unreasonable, the district court erroneously endorsed it. ROA 646. Rowan did not strategically "elect[] not to call [Jerome] as a witness"; he failed to conduct a reasonable investigation that would have allowed him to make such a strategic decision. *See Richter*, 562 U.S. at 109; *Wiggins*, 539 U.S. at 527-28. Even if counsel had been in a position to make such a decision, it wouldn't have been reasonable. The State presented 14 aggravation witnesses to demonstrate

---

[27]Rowan testified even if most of Cole's and Miller's testimony was hearsay, it wouldn't be less valuable. Evid.Hr.I 239.

Frederick's "violent, criminal past." ROA 354. Unlike these witnesses, Jerome didn't have personal knowledge of Frederick's alleged violent conduct.[28] He did, however, have extensive personal knowledge of Frederick's childhood of abuse and dysfunction, which could have helped explain his "violent, criminal past." ROA 354. Counsel left this past unexplained and unchallenged. Jerome's testimony couldn't have seriously harmed, but would have immensely supported, the defense.

OCCA's finding that Jerome "knew Petitioner had threatened young women" was also unreasonable. ROA 351. Instead, Jerome testified that in both alleged incidents that resulted in acquittals, Frederick "was threatened." Evid.Hr.I 152-53.

OCCA's determination that Jerome "knew of Petitioner's 2009 guilty pleas to assaulting DaJon Diggs and the decedent" was unreasonable. ROA 351. Frederick never pled guilty to assaulting Diggs or his mother, nor have there been allegations any such assaults occurred prior to Ms. Frederick's alleged homicide. Instead, Jerome *himself* pled guilty to such assaults in 2008. Evid.Hr.I 160, 165; Evid.Hr. St.Ex. 2. This fact is far less damaging to Frederick's mitigation case than if he himself had

---

[28]Jerome testified at the hearing he had heard about the alleged barbershop incident (which led to charges of kidnapping and assault with a dangerous weapon), the alleged incident involving Quinola Nelson (which led to charges of murder and assault with a dangerous weapon), and the rape allegations. Evid.Hr.I 151-57; O.R. 529-32. Frederick was acquitted of all charges stemming from the alleged incidents at the barbershop and involving Nelson. O.R. 529-32. Regarding the rape allegations, Jerome testified, "I've heard allegations of it, but I don't know anything about it. I wasn't there." Evid.Hr.I 154. The State never charged Frederick with rape, and the jury in this case heard no such allegations.

pled guilty to assaulting the alleged victims in this case, as OCCA found.[29]

OCCA's no-deficient-performance finding based on Jerome's testimony was an unreasonable application of *Strickland* and contrary to *Williams*, where the Court found:

> Of course, not all of the additional evidence was favorable to Williams . . . But . . . the failure to introduce the comparatively voluminous amount of evidence that did speak in Williams' favor was not justified by a tactical decision . . . . Whether or not those omissions were sufficiently prejudicial to have affected the outcome of sentencing, they clearly demonstrate that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background.

529 U.S. at 396. Similarly, here, even assuming Jerome's testimony was not all favorable, counsel's failure to present his voluminous testimony about Frederick's childhood "demonstrate[s] that trial counsel did not fulfill [his] obligation to conduct a thorough investigation." *Id.*

Finally, OCCA found:

> Mr. Rowan testified he thought it would not be beneficial and a "very bad thing" to show Petitioner grew up in a dysfunctional family where his father "masqueraded" as a Godly figure and where the decedent was

---

[29]     The district court found:

> [T]his error does not fatally corrupt the OCCA's analysis of this claim because, in addition to the misstatement regarding the 2009 assault, the OCCA correctly noted that Jerome testified about several other violent acts involving Petitioner. The OCCA's decision does not rest upon this misstatement and is therefore not a basis for relief.

ROA 646 n.12. The court's finding that "Jerome testified about several other violent acts" is clearly erroneous. As explained above, the only "violent acts involving Petitioner" about which Jerome could have testified were those of which he had no personal knowledge. ROA 646 n.12.

53

"required to raise kids that were the products of his ministering to vulnerable women."[30]   Mr. Rowan said that to present that kind of evidence was "very dangerous because you're besmirching the dead" and he would be "disparaging" a culture he did not understand.

ROA 351. The district court erroneously concluded "[Rowan] had clearly put some thought into whether presenting family members to testify regarding Petitioner's upbringing was an appropriate mitigation strategy, which undercuts his claim that he had no strategic reason for not interviewing family members." ROA 645. Again, Rowan didn't make a reasonable strategy decision not to present this evidence. *See Wiggins*, 539 U.S. at 527-28. Counsel had a duty to investigate his client's background, which inevitably involved his parents. That they were deceased and his mother was the alleged victim didn't relieve counsel of that duty. Rowan's admission "I don't think I really understood the culture that I would've been disparaging" further demonstrates his IAC. Evid.Hr.I 237. An attorney has an obligation to seek an understanding of his capital client's background so he can present it to the jury. *See, e.g., Porter*, 558 U.S. at 39; *Battenfield*, 236 F.3d at 1229.

OCCA found, "Rowan is an experienced capital litigator well known to this Court." ROA 353. However, "the objective reasonableness of counsel's performance is not assessed by the attorney's general legal skill, experience, and knowledge." *See Stouffer v. Reynolds*, 168 F.3d 1155, 1168 (10th Cir. 1999)."'When the choice is between life and death,' [*Lockett*, 438 U.S. at 605], . . . '[t]hat a person who happens to be a lawyer is present at trial alongside the accused . . . is not enough to satisfy the

---

[30]Rowan did not testify it would be "'a very bad thing' to show Petitioner grew up in a dysfunctional family." ROA 351. Instead, Rowan testified *growing up in* this family "was a very bad thing." Evid.Hr.I 236-37.

constitutional command.'" *Id.* (quoting *Strickland*, 466 U.S. at 685). "[A] single, serious error may support a claim of ineffective assistance of counsel." *Kimmelman v. Morrison*, 477 U.S. 365, 383 (1986).

Counsel's failure to interview family members and present the true picture of Frederick's childhood was unreasonable. *See Anderson*, 476 F.3d at 1143-48 (deficient performance; counsel failed to investigate evidence including that petitioner's mother "would whip [the children] with hangers and extension cords" and had "illicit affairs in the family home"); *Hooks v. Workman*, 689 F.3d 1148, 1203-04, 1207 (10th Cir. 2012). Rowan provided IAC in failing to interview family members and, as a result, presenting zero live witnesses in his capital client's sentencing stage.

### ii.    Prejudice.

OCCA's prejudice determination was contrary to and an unreasonable application of *Strickland*, and contrary to its progeny. ROA 355-56. Frederick doesn't dispute OCCA's findings that Frederick, Sr.'s testimony "showed Petitioner did not have a good relationship with his father, left home at an early age and entered the criminal justice system as a juvenile." ROA 355. However, the mitigation evidence discovered on post-conviction showed much more than these bare facts. Had Rowan adequately investigated, he could have shown why Frederick and his father "did not have a good relationship" and why Frederick "left home at an early age." ROA 355. He could have discredited Frederick, Sr.'s testimony that Darrell had "led a pretty sheltered life" and showed Darrell left home at 14 not because he was "immature," Tr.VIII 1506-07, but because he faced relentless abuse, culminating in a final beating that forced him to leave, Evid.Hr.I 124-29. The *Porter* Court found, "It is

55

unreasonable to discount to irrelevance the evidence of Porter's abusive childhood
. . . ." 558 U.S. at 43. *See Wiggins*, 539 U.S. at 534-35.

The district court erred in endorsing OCCA's unreasonable finding that many
relevant incidents "occurred after Petitioner left home." ROA 356, 648 n.13. The vast
majority of the incidents about which Jerome testified occurred throughout
Frederick's childhood. Those incidents that occurred after Frederick left home
support Jerome's testimony about his and Darrell's tumultuous childhood and provide
context to show the dysfunctional atmosphere in which Frederick was raised, rather
than the "sheltered" atmosphere presented. Tr.VIII 1507. Had the jury heard the full
story, "there is a reasonable probability that at least one juror would have struck a
different balance." *Wiggins*, 539 U.S. at 537.

Furthermore, in finding "even if further evidence of Petitioner's troubled
childhood was introduced, it is not clear it would have been sufficient to mitigate
Petitioner's adult conduct," ROA 356, OCCA unreasonably applied *Strickland* and
acted contrary to its progeny in failing to recognize this mitigation need not outweigh
the aggravation to find prejudice. "Mitigating evidence unrelated to dangerousness
may alter the jury's selection of [a] penalty, even if it does not undermine or rebut the
prosecution's death-eligibility case." *Williams*, 529 U.S. at 398.  Any argument the
case in aggravation against Frederick was so strong as to conclude he wasn't
prejudiced by counsel's failures is contrary to *Williams.* This Court found in
*Anderson*, "Although the case against Anderson was strong and the murders . . . were
horrific, courts have not hesitated to grant relief in similar circumstances where the
absence of available mitigation evidence left the jury with a 'pitifully incomplete'

56

picture of the defendant." 476 F.3d at 1146-48. These are such circumstances.

Finally, in its prejudice analysis, OCCA failed to address the impact of the *positive* testimony the family witnesses could have provided about Mr. Frederick.[31] As a result, this Court should review *de novo* the merits of the claim regarding positive family evidence. In the alternative, if the Court determines OCCA's finding of no prejudice applies to the entirety of the family-witness evidence, then it was an unreasonable application of *Strickland* and contrary to its progeny, as well as being based on unreasonable factual determinations, for the reasons above and because OCCA ignored the positive evidence the family could have provided. Since the alleged victim was his mother, it was especially critical for the jury to hear the family's positive testimony about him. "[T]here is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537.

### ii.    Dr. Art Williams.

Hammarsten listed Dr. Art Williams on the sentencing-stage witness list. O.R. 604-05. In his penalty-phase opening, Rowan announced he would present testimony from Williams detailing Frederick's life history. Tr.VII 1292. However, Rowan failed to call Williams. Walker alleged IAC for this failure. ROA 133-34. However, Walker was ineffective for failing to present Williams's report demonstrating the resulting prejudice. ROA 186-88.

Williams provided his conclusions to Rowan in a pretrial report. O.R. 605, 615;

---

[31]The district court found, "[T]here is nothing to suggest [OCCA] did not consider this evidence when performing its analysis." ROA 650 n.14. This is clearly erroneous. OCCA explicitly limited its analysis to the impact of the evidence regarding abuse and dysfunction. ROA 355-56.

APCR Att. 32, Ex. 2 ("Williams Rpt."). Williams explained he reviewed police reports and other records; interviewed Frederick's sister, Karen; and spent approximately three hours with Frederick, who "was very circumspect and suspicious." *Id*. at 1. Williams reported about the family dysfunction Frederick suffered as a child. *Id*. at 1-4. Williams reported Frederick was "placed in special education classes at an early age because he struggled with reading and comprehension." *Id*. at 2. "Being placed in Special Education classes was humiliating for Frederick, leaving him rebellious and angry." *Id.*

Williams reported, "According to Karen Frederick, it was difficult growing up because of the dysfunction in the family. Three of the Frederick boys escaped for an unspecified period of time to the grandparents' farm in Gaus, Texas." *Id.* at 4. Frederick was "'on his own' since age 14." *Id.* at 2. At age 15, the State placed Frederick in Helena Boys' Home, later "closed due to abuses to children." *Id.* at 3 n.4*. At age 16, the State placed Frederick in "a hardened adult prison." *Id.* at 5. Frederick witnessed violence and rapes in prison. *Id.* at 6. Williams described the legal troubles of six of Frederick's siblings and half-siblings. *Id.* at 4. Williams reported, "In 1997, at the age of 42," he tested "equivalent to a sixth grade education, as well as a language comprehension at the 4th grade level." *Id.* at 2. Williams concluded that as a result of Frederick's boxing history and childhood automobile accident, "brain damage from insults cannot be ruled out." *Id.* at 2-4. Frederick was released from the Oklahoma County Jail in 2009 after almost 40 years in custody. *Id.* at 3. Williams concluded that as a result of his nearly-lifelong incarceration, Frederick had become "fully institutionalized" and explained how this impacted him. *Id.* at 4-7.

> a.   **The District Court Erred by Endorsing OCCA's Performance and Prejudice Determinations.**

> i.   **Appellate IAC.**

OCCA's finding on post-conviction that "the claim was sufficiently raised in the direct appeal"[32] was an unreasonable application of *Strickland*, contrary to its progeny, and based on an unreasonable determination of fact. ROA 356; § 2254(d)(1), (2). As a matter of both fact and law, Walker did not sufficiently raise the claim.

IAC requires a showing of prejudice. *See, e.g., Richter,* 562 U.S. at 104. Because Walker didn't provide Williams's report to OCCA, she was left to argue vaguely that Williams would have told the jury about "Frederick, his life and background." ROA 133. Walker's failure to present Williams's report prejudiced Frederick because without it, OCCA was unable to find IAC.[33] *See Strickland*, 466 U.S. at 694; *Sears*, 561 U.S. at 955. Under *Strickland*, "ineffective appellate assistance can be established on the basis of the demonstrable merit of the issue omitted by counsel on the petitioner's direct appeal." *Cargle*, 317 F.3d at 1205. "If the underlying issue was not valid, . . . counsel was not ineffective for failing to raise it on direct appeal." *English v. Cody*, 241 F.3d 1279, 1283 (10th Cir. 2001). Here,

---

[32]If this Court finds this determination by OCCA related only to the deficient-performance prong, it should review the prejudice prong *de novo*.

[33]Walker's failure to present Williams's report to OCCA impacted both its prejudice and performance findings. Without knowing Williams's testimony, it was impossible for OCCA to reasonably determine whether counsel performed deficiently in failing to present it. Analyses of the two *Strickland* prongs are interrelated. *See Sears*, 561 U.S. at 953.

"the underlying issue was . . . valid." If Walker had presented Williams's report, there is "a reasonable probability" OCCA would have found trial IAC. *Neill*, 278 F.3d at 1057 n.5.

### ii.    Underlying Trial IAC.

On post-conviction, OCCA reiterated its direct-appeal finding that Rowan's "decision not to call Dr. Williams to testify was reasonable trial strategy." ROA 356. On direct appeal, OCCA found Rowan's decision not to call Williams was based on Frederick's "failure to cooperate," "the intense scrutiny [Williams] would have been placed under during cross-examination," and the possibility he or a rebuttal expert witness might reveal Frederick's prior murder acquittal. *Frederick*, 400 P.3d at 831. OCCA's finding of reasonable trial strategy was based on an unreasonable determination of fact and was an unreasonable application of *Strickland* and contrary to its progeny. § 2254(d)(1), (2).

OCCA's finding that Rowan's decision not to call Williams was based in part on Frederick's "failure to cooperate" was factually unreasonable. *Frederick*, 400 P.3d at 831. Before trial, Rowan knew Williams hadn't conducted psychological testing. O.R. 605; M.Tr. 8/15/14 at 80, 89; Williams Rpt. at 1. Despite his longstanding knowledge that Williams conducted no testing, Rowan repeatedly announced his plan to call Williams. Tr.I 28-29; Tr.VII 1287, 1292. Rowan also knew at trial that Williams wasn't qualified to make psychological diagnoses, and told the jury as much. Tr.VII 1292. *See also* Evid.Hr.I 204; APCR Att. 32 ("Williams Aff."), ¶ 6. Due to Rowan's knowledge that Williams hadn't tested and was unqualified to diagnose Frederick, Rowan's failure to call him cannot reasonably be attributed to Frederick's

60

"failure to cooperate" with testing. *Frederick*, 400 P.3d at 831.

OCCA's finding of reasonable trial strategy was also an unreasonable application of *Strickland* and contrary to its progeny. Williams was qualified and well-equipped with information to testify about Frederick's life history. The jury heard a great deal about Frederick's life of incarceration and allegations against him of violence. Without Williams's testimony, counsel was unable to put this history into a context that could have helped Frederick by showing a complete picture of his life. *See Sears*, 561 U.S. at 951; *Wiggins*, 539 U.S. at 534-35; *Mayes*, 210 F.3d at 1288 (quoting *Lockett*, 438 U.S. at 603).

In addition to erroneously endorsing the reasons for Rowan's failure to call Williams that were propounded by him and adopted by OCCA, ROA 653-54 & n.17, the district court found "the decision not to call Williams prevented the prosecution from introducing testimony that Petitioner had previously made statements denying a brain injury." ROA 654 (citing Tr.VIII 1517). Contrary to this clearly erroneous finding, the proposed rebuttal evidence, as described by the State at trial, would have shown that Frederick consistently reported the facts underlying his brain damage.[34] Tr.VIII 1524.

OCCA's prejudice determination on direct appeal was an unreasonable

---

[34]The district court concluded, "Perhaps in hindsight a different decision would have been better, particularly given the lack of other mitigating evidence Mr. Rowan had available. . . .'" ROA 654. The court didn't explain what relevant information is newly available. According to Rowan, he decided not to call Williams on the day of sentencing-stage closing arguments – the day the State rested its aggravation case and Rowan knew he wouldn't be presenting mitigation witnesses.

application of *Strickland* and contrary to its progeny because OCCA didn't have the facts it needed. *Frederick*, 400 P.3d at 831. *See Strickland*, 466 U.S. at 694; *Sears*, 561 U.S. at 955; *Wiggins*, 539 U.S. at 537. It was also factually unreasonable. OCCA unreasonably found Rowan's failure to call Williams "was easily explained in closing argument." *Frederick*, 400 P.3d at 831. Although Rowan explained Frederick "resisted" a mental health evaluation, Williams wasn't qualified to diagnose Frederick. Tr.VIII 1585. Finally, OCCA's determination that "[a]s . . . counsel told the trial court, much of what Dr. Williams would have testified to was already before the jury" was unreasonable. *Frederick*, 400 P.3d at 831. Rowan told the court the jury knew Frederick was institutionalized. Tr.VIII 1516. However, the jury hadn't heard that or much of the evidence to which Williams could have testified, including evidence of Frederick's educational struggles; dysfunctional childhood; or time in the Helena Boys' Home. Williams Rpt.

Apparently intending to introduce evidence of institutionalization, counsel embraced Frederick's history of incarceration, describing Frederick's convictions in detail. Tr.IV 795-96; Tr.VII 1297-98. *See also* Tr.IV 798-99 (explaining Frederick "is a product of his incarceration"). However, Rowan never presented evidence of Frederick's institutionalization. As a result, he resorted to telling the jury, "I think the manner and how [the alleged homicide] happened from a tussle over orange juice . . . it happened very quickly. And I don't . . . have an excuse for that." Tr.VIII 1582. Williams could have provided an explanation. *See* Williams Rpt. at 4-5.

Without Williams's testimony, the jury heard no evidence to support Frederick's third and fourth mitigators. O.R. 927. There is a reasonable probability

if the jury had heard evidence in support of two of the five mitigators "at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537.

### iii. Evidence of Brain Damage.

No mental health expert evaluated Frederick until post-conviction, when two psychologists evaluated him and found brain damage. Red flags indicated to trial counsel that Frederick had mental health issues: Counsel in previous cases had difficulties working with him, and he had received competency evaluations in two earlier cases. Evid.Hr.III 569; Tr.VIII 1517-18. Hammarsten also alleged difficulties communicating with him. Evid.Hr.I 57; Evid.Hr.III 605-06. Due to concerns about his mental health, she considered seeking a competency evaluation for him before his trial. Evid.Hr.III 614-15, 619-20; M.Tr. 12/20/13 at 13. Instead, she asked to be removed from the case. In-Camera Hr.Tr.12/20/13 at 4-5. She was replaced by Rowan, who testified to similar difficulties communicating with Frederick. Evid.Hr.I 210-11.

In addition to Hammarsten's and Rowan's own experiences with Frederick, Dr. Williams alerted them to possible mental health issues. Hammarsten hired Williams, a sociologist, to prepare a social history. Evid.Hr.III 616, 618. At the hearing where she was removed as counsel, Hammarsten explained Williams "suspects . . . some of what is going on with him is related to the fact that he has brain damage" due to boxing and a childhood "car wreck where he was unconscious for 15 minutes." In-Camera Hr.Tr. 12/20/13 at 5.

In Williams's pretrial report, he noted, "Frederick was very circumspect and suspicious about providing information and refused to cooperate in testing." Williams

Rpt. at 1. He reported Frederick had competed on a prison boxing team, possibly without proper equipment, and "brain damage from insults cannot be ruled out." *Id.* at 3-4.  On post-conviction, Williams explained while he is "trained to recognize mental illness and brain injury," he is "not qualified to actually diagnose." Williams Aff. ¶ 6. He "would have . . . recommended that a qualified neuropsychologist and/or psychiatrist examine Mr. Frederick to explore formal diagnoses of mental disease and/or traumatic brain injury." *Id.*

Despite the red flags, counsel never hired a mental health expert. Such an expert could have testified during the sentencing stage about Frederick's brain damage and how it would have affected his behavior. Instead, Frederick's mitigation case consisted of the 1982 testimony of his deceased father, which included testimony about an automobile accident in which Darrell "hit his head on the windshield" and "was a changed child from that very moment." Tr.VIII 1498.

After the defense rested, the State expressed concern that Rowan had proposed two mitigators regarding brain damage but hadn't presented evidence in support:

> [T]he very first thing that they want to submit to this jury is that Darrell Frederick suffered a severe concussion in his early teen years which resulted in damage to the brain. The second mitigator that they want to submit is the concussion . . . caused Darrell Frederick the [sic] lose the ability to control his impulses. So they're -- they're putting this issue front and center.

Tr.VIII 1524-25. The State complained there had "been absolutely no evidence" of either of these mitigating circumstances. Tr.VIII 1525-26. The court agreed, ruling, "There's got to be some evidence put in somewhere as to these mitigating circumstances. You can't just say something with no evidence . . . ." Tr.VIII 1526-27.

Rowan agreed to "modify my mitigator . . . to conform to the evidence."[35] Tr.VIII 1527.

The State asked to present a rebuttal to Frederick, Sr.'s testimony to show Frederick "doesn't have any type of long-term head injury." Tr.VIII 1528. After noting there was "no evidence that he had a long-term head injury," Tr.VIII 1528, the court allowed the State to call Karen Frederick. She testified she witnessed the accident. Tr.VIII 1541-42. She remembered injuries, but to her knowledge, Darrell didn't need stitches. Tr.VIII 1542-43. She denied noticing changes to Darrell's behavior.[36] Tr.VIII 1544.

Because of his failure to investigate and present evidence of brain damage, Rowan said during his sentencing-stage closing:

> Now we've not presented you a neuroscientist[,] . . . a psychiatrist or a clinical psychologist to explain that we have examined Darrell now and he now has that brain damage. He simply wouldn't let us, resisted that kind of intrusion.[[37]] So all we have is, you know, anecdotal evidence.

---

[35] After the modification, the relevant mitigator was: "Frederick had an accident in the truck, ran into a post and hit his head on the windshield, busted the windshield out of the truck and changed from that very moment." O.R. 927.

[36] Dr. Grundy, a psychologist hired on post-conviction, explained Karen's statements "do not appear to be a valid method of observation" since she was 12 years old. APCR Att. 39, Ex. 2 ("Grundy Rpt.") at 11.

[37] According to the original record, Frederick has never resisted an evaluation by a mental health expert. According to the prosecution, Frederick was "very cooperative" with Dr. Shawn Roberson during his 2004 and 2009 competency evaluations in other cases. Tr.VIII 1524-25. Frederick also cooperated with Grundy's and McGarrahan's psychological testing in 2016 and 2017, respectively. Grundy Rpt. at 8; Evid.Hr.IV 745. Finally, although not in the original record, Frederick cooperated again with McGarrahan's testing in 2019. ROA 400.

You know that a crash that knocks your teeth out, that knocks the windshield out, takes -- the father takes you to get an X-ray. An X-ray can't show . . . damage to the brain.

And I can't prove to you beyond a reasonable doubt that that was the etiology or the beginning of his bad behavior. . . . But it's logical. . . . I mean, don't football players go out and spend several weeks in -- under observation when they get a concussion? . . . And there's an executive function in the brain that governs impulses. And every one of Darrell's crimes, every one of Darrell's --

Tr.VIII 1585-86. At this point, the State rightfully objected:

I think Mr. Rowan is arguing facts that are not in evidence. There's been no evidence about -- about brain impulsivity or any of that. . . . He's . . . to argue the evidence and not just make some stuff up.

Tr.VIII 1586. The following exchange then occurred:

| | |
|---|---|
| Rowan: | It's common sense, Judge, that a concussion or a brain injury is going to cause brain damage. And people know it's impulsive. |
| Lavenue: | They could've presented an expert that said traumatic brain injuries cause[] impulsivity. I don't know that that's true. I don't think that's common sense. And there's been no testimony of it. And he shouldn't be allowed to testify to the jury about things that aren't in evidence. |

Tr.VIII 1586-87. The judge ruled Rowan was "allowed in closing arguments to take what the evidence is and then bring what he believes is a reasonable hypothesis to those facts." Tr.VIII 1587. Rowan then continued his closing argument:

As I said, I can't prove to you that insults to the brain cause impulsivity. But I think we all have our common sense. We all have our experiences in life to know intuitively that's true, that . . . -- you protect the brain. You wear a helmet when you play football. But every one of the incidents -- . . . Anita Wood, Karen Frederick; they all go from a dead stop to very violent in an instant with no explanation. I think there is an explanation but we're not scientists enough to know precisely what that explanation is.

Tr.VIII 1587. In fact, McGarrahan was "scientist[] enough to know precisely what that explanation is," but Rowan never consulted her or any other mental health expert.

66

Similarly, Walker never consulted any mental health expert and didn't raise an IAC claim based on Rowan's failure to do so. Walker testified that after reading the trial record, she had concerns about Frederick's mental health. Evid.Hr.II 423-24. She testified "a large part of Mr. Rowan's case, although it wasn't supported by hardly any evidence, was that Darrell had some sort of . . . brain damage which propelled him to not have really good control over his emotions." Evid.Hr.II 424. Walker met Frederick once, and although he "talked a lot" and was "friendly," she "felt like [he] probably had a mental illness in that he was very suspect." Evid.Hr.II 424. She could not think of a strategic reason for failing to attempt to retain a mental health expert. Evid.Hr.II 425.

Finally, on post-conviction, counsel retained Dr. Curtis Grundy, an expert in clinical and forensic psychology. He concluded Frederick had "indicators of possible traumatic brain injury" and referred him for neuropsychological testing.[38] Grundy Rpt. at 10, 12; Evid.Hr.IV 692-93. Accordingly, post-conviction counsel retained an expert in neuropsychology, Dr. Antoinette McGarrahan, to administer neuropsychological testing. Evid.Hr.IV 744.

After administering a battery of "objective standardized tests," Evid.Hr.IV 762, 798, McGarrahan concluded, "Mr. Frederick does have significant indicators of brain damage. We would call it generally global reduction, meaning an overall reduction in his intellect. In addition, there's primary impairment of his frontal lobes or executive functioning . . . ." Evid.Hr.IV 763. The frontal lobe "controls certain

---

[38]Grundy also diagnosed Frederick with Paranoid Personality Disorder and Antisocial Personality Disorder. Grundy Rpt. at 9-10.

aspects of behavior," including "aggression, violence, acting out, impulsivity." Evid.Hr.IV 764. The frontal lobe also "has a cognitive component," controlling "higher order or complex skills, such as planning and organizing and abstract reasoning and decision-making." Evid.Hr.IV 764-65. Finally, the frontal lobe "has an emotional component"; it "helps regulate our emotions." Evid.Hr.IV 765. McGarrahan concluded Frederick's brain injury was likely the result of his automobile accident and the blows to the head he suffered while he served on the prison boxing team.[39] Evid.Hr.IV 781.

Trial and appellate counsel performed deficiently in failing to investigate and present the testimony of a mental health expert like McGarrahan. Those failures prejudiced Frederick.

### a.     Counsel Performed Deficiently.

OCCA addressed this claim's merits on post-conviction. Citing *Strickland*, OCCA found no IAC. ROA 357-64. OCCA's finding that counsel did not perform deficiently was an unreasonable application of *Strickland*. It was also contrary to *Strickland*'s progeny, including *Wiggins*, *Porter*, *Williams*, *Rompilla*, and *Sears*, which OCCA didn't cite in its analysis. § 2254(d)(1). It was also based on unreasonable factual determinations. § 2254(d)(2).

OCCA found Rowan's performance was not deficient because his "decision not to present any mental health evidence was a strategic choice made after reasonable investigation and within the exercise of reasonable professional judgment." ROA 363.

---

[39]Frederick also reported being assaulted in prison in 1983 and losing consciousness. Grundy Rpt. at 5; ROA 402.

This was factually and legally unreasonable. Contrary to OCCA's finding, Rowan didn't make a "strategic" "decision not to present any mental health evidence." ROA 363. The district court correctly found:

> [T]here can be no disputing that Mr. Rowan was aware that Petitioner potentially suffered from brain damage. Not only was he alerted to it by Dr. Williams' pretrial report, but he made the effects of Petitioner's childhood head injury the central theme of his mitigation case. Despite embracing Petitioner's head injury as the reason for his violent actions, Mr. Rowan never consulted with an expert trained to diagnosis [sic] or evaluate brain damage.

ROA 658.

Counsel failed to perform the "thorough investigation" required by *Strickland*, 466 U.S. at 690. He failed to investigate the "facts relevant to plausible options" by failing to consult a mental health expert. *Id.* Despite red flags[40] including an expert's recommendation, Rowan never sought the expertise of a mental health professional. Further, he did not "make a reasonable decision that [made] particular investigations unnecessary." *Id.* at 691. To the contrary, as found by the district court, ROA 658, he "embrac[ed] Petitioner's head injury." At the post-conviction hearing, Rowan testified that if he had discovered the brain damage evidence, he would have used it, and he couldn't think of any strategic reason for not doing so. Evid.Hr.I 204-05.

Rowan "ignored pertinent avenues for investigation of which he should have been aware." *Porter*, 558 U.S. at 40. In *Porter*, the Supreme Court found deficient performance where, due to inadequate investigation, "[c]ounsel . . . failed to uncover

---

[40]In *Hooks*, this Court explained, "Mr. Hooks's premature birth, the head injury he suffered in an eighteen-wheeler accident, and the problems he experienced thereafter were clear markers for organic brain damage."689 F.3d at 1205.

and present any evidence of Porter's mental health or mental impairment," among other evidence. *Id.* As in *Wiggins*, OCCA's "deference to counsel's strategic decision," "despite the fact that counsel based this alleged choice on . . . an unreasonable investigation, was . . . objectively unreasonable." 539 U.S. at 528. Here, following his unreasonable investigation, counsel never even made an "alleged choice" to reject the brain-damage mitigation theory. *Id.* Rowan performed deficiently in failing to investigate and present that his client "had suffered repeated head injuries, and might have mental impairments organic in origin." *Williams*, 529 U.S. at 370. *See also Sears*, 561 U.S. at 949-51 (mitigation investigation inadequate where undiscovered evidence included "significant frontal lobe abnormalities").

This Court's "analysis . . . is guided by the Supreme Court's . . . jurisprudence emphasizing the importance of thorough investigation – in particular, of mental health evidence – in preparation for the sentencing phase of a capital trial." *Wilson v. Sirmons*, 536 F.3d 1064, 1083 (10th Cir. 2008). This Court has emphasized "because of the crucial mitigating role that evidence of . . . mental health problems can have in the sentencing phase, defense counsel must pursue this avenue of investigation with due diligence." *Id.* at 1085. *See also Smith*, 379 F.3d at 942. Here, even after an expert alerted him to the possibility of brain damage, counsel conducted *no* inquiry into his client's mental health. This constituted deficient performance, and OCCA's finding to the contrary was unreasonable.

OCCA unreasonably found "[Rowan's] testimony showed he did speak to Dr. Williams and did try to get Petitioner evaluated by mental health experts" but "Petitioner would not cooperate." ROA 361. The district court found:

70

> Petitioner was not cooperative with Dr. Williams and Ms. Hammarsten testified that Petitioner "was adamant he would not take testing from anyone" and "wouldn't meet with psychologists." . . . But Mr. Rowan replaced Ms. Hammarsten as Petitioner's counsel precisely *because* Petitioner was not cooperating with her. . . . Ms. Hammarsten testified that Petitioner "was so happy to be getting rid of me, yes, he would've cooperated with somebody else." Further, the state court judge who presided over the replacement of Ms. Hammarsten advised Petitioner that a new lawyer would bring experts in to speak with him, but these actions were not taken by Mr. Rowan. . . .

ROA 658 (internal citations omitted). The district court concluded, "Because Mr. Rowan was specifically brought into the case in order to restore the attorney/client relationship, using Petitioner's lack of cooperation with Ms. Hammarsten[41] as justification for Mr. Rowan's failure to consult with a mental health expert is problematic." ROA 658-69.

Relatedly, OCCA unreasonably found:

> [Rowan] said Petitioner insisted he was innocent and would not cooperate in obtaining or presenting any evidence that he fatally struck his mother, yet did not understand or appreciate what he was doing. Mr. Rowan said he did not retain any mental health experts because it would have been against his client's wishes.

ROA 360. The district court correctly found:

> While Mr. Rowan testified that he did not think Petitioner "was particularly interested in being examined by a neuropsych," he also testified that his conversations with Ms. Hammarsten "clouded [his] judgment in trying to talk [Petitioner] into having somebody examine

---

[41]OCCA's finding that "Petitioner also did not cooperate with Ms. Hammarsten's efforts to have him evaluated" was factually unreasonable. ROA 361-62. Although Hammarsten testified Frederick "was adamant he would not take testing from anyone," she admitted that the only expert she consulted was Williams and that "the testing he would do would not be the kinds of tests that a psychologist would give." Evid.Hr.III 616-17. Contrary to OCCA's finding, ROA 359, Hammarsten didn't testify about any "subsequent attempts to have him evaluated."

[Petitioner]," and that he made an assumption regarding Petitioner's cooperation with experts. . . . Mr. Rowan testified that Petitioner never told him that he would not cooperate with a mental health expert. . . . Given this testimony, and Mr. Rowan's concession that he did not consult with a mental health expert or try to have Petitioner evaluated by a mental health expert, . . . it is difficult to see how the OCCA could reasonably conclude that Mr. Rowan "did try to get Petitioner evaluated by mental health experts." . . .

ROA 659 (internal citations omitted).

OCCA's finding that "Petitioner only cooperated with the mental health experts after he had been convicted and given the death sentence" was factually unreasonable. ROA 362. Frederick has never resisted an evaluation by a mental health expert. No mental health testing was sought in this case before his sentence, and according to the prosecution, Frederick was "very cooperative" with Dr. Roberson during competency evaluations in other cases. Tr.VIII 1524-25.

OCCA unreasonably found, "There is no indication [Frederick] disagreed with counsel's decision not to present additional mitigating evidence." ROA 362. On the contrary, the record indicates Frederick's disagreement. In-Camera Hr.Tr. 12/20/13 at 14 ("I believe that I should fight until I do die. . . . [D]on't give up, don't stop."); Sent.Tr. 5 ("I had no mitigating evidence of anything to my behalf" and "during the middle of the trial I could see my lawyer actually really didn't do nothing"); Evid.Hr.I 191 ("I guess it's the purpose of the hearing for [Rowan] to say what went on because of him and I know for a fact that nothing going on. . . . [H]e never did anything . . . .").

In addition to being factually unreasonable, OCCA's reliance on Frederick's alleged lack of cooperation was an unreasonable application of *Strickland* and

contrary to its progeny. ROA 361-62. *See supra* at 48-49. The district court correctly found:

> [T]hat Petitioner may have been uncooperative or obstinate does not relieve counsel of the duty to perform a reasonable mitigation investigation. *Porter* . . ., 558 U.S. . . . at 40 . . . . Where counsel is aware of possible brain damage and chooses to make it a central theme in his mitigation case, one would expect counsel to at least attempt to have his client evaluated by a qualified mental health expert, even if he anticipated that the client may not actively participate in the evaluation.

ROA 659.

Relatedly, OCCA unreasonably applied *Faretta v. California*, 422 U.S. 806, 819 (1975), in suggesting that the decision of what mitigating evidence to present lay with Frederick. ROA 362. *Faretta* explains, "[W]hen a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas." 422 U.S. at 820. These strategy decisions include the investigation and presentation of mitigation evidence, which is counsel's – not his client's – duty. *See Rompilla*, 545 U.S. at 381; *Porter*, 558 U.S. at 40.

OCCA's reliance on Rowan's "experience as a capital litigator" and "testimony regarding the . . . importance of . . . mitigation" to find no deficient performance was an unreasonable application of *Strickland* and contrary to its progeny, including *Kimmelman*, 477 U.S. at 383. ROA 361. *See supra* at 54-55.

Despite disagreeing with many of OCCA's findings related to whether counsel performed deficiently, the district court concluded: "[T]he Court need not resolve whether the OCCA reasonably found that counsel's investigation into mental health evidence was sufficient, because Petitioner cannot carry his burden of showing that

73

the OCCA's finding as to prejudice is unreasonable." ROA 660.

### b.     The District Court Erred by Endorsing OCCA's Prejudice Determination.

Contrary to the district court's conclusion, OCCA's finding of no prejudice was an unreasonable application of *Strickland*, contrary to its progeny, including *Wiggins*, *Porter*, *Williams*, *Rompilla*, and *Sears*, and based on unreasonable factual determinations. ROA 363-64; § 2254(d)(1), (2).

The Supreme Court has emphasized the mitigating value of brain damage evidence. In *Rompilla*, post-conviction counsel "found that Rompilla 'suffers from organic brain damage . . . significantly impairing several of his cognitive functions.'" 545 U.S. at 392 (citation omitted). The Supreme Court held, "This evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury . . . . [T]he likelihood of a different result if the evidence had gone in is 'sufficient to undermine confidence in the outcome' . . . ." 545 U.S. at 393 (quoting *Strickland*, 466 U.S. at 694). In *Porter*, the Court found:

> [The state courts did not] g[i]ve any consideration . . . to [neuropsychology expert] Dr. Dee's testimony regarding the existence of a brain abnormality and cognitive defects. While the State's experts identified perceived problems with the tests that Dr. Dee used and the conclusions that he drew from them, it was not reasonable to discount entirely the effect that his testimony might have had on the jury . . . .

558 U.S. at 42-43. Here, although OCCA identified some "perceived problems" with McGarrahan's testimony, "it was not reasonable to discount entirely the effect that [the] testimony might have had on the jury." *Id.* at 43.

This Court has repeatedly emphasized the importance of this evidence:

> "[E]vidence of mental impairments is 'exactly the sort of evidence that

74

garners the most sympathy from jurors,' and . . . this is especially true of evidence of organic brain damage." [*United States v. Barrett*,] [(]*Barrett II* [)], 797 F.3d [1207,] 1231 [2015] (quoting *Smith*, 379 F.3d at 942); *see also Grant v. Royal*, 886 F.3d 874, 920 (10th Cir. 2018) ("Evidence of organic brain damage is something that we and other courts, including the Supreme Court, have found to have a powerful mitigating effect.") (quotations omitted); *Littlejohn v. Trammell*, 704 F.3d 817, 864 (10th Cir. 2013) ("Evidence of organic mental deficits ranks among the most powerful types of mitigation evidence available.").

*United States v. Barrett* (*Barrett III*), 985 F.3d 1203, 1222 (10th Cir. 2021). "And for good reason – the involuntary physical alteration of brain structures, with its attendant effects on behavior, tends to diminish moral culpability, altering the causal relationship between impulse and action." *Hooks*, 689 F.3d at 1205. In *Anderson*, the this Court explained: "Anderson's brain deficits affect his reasoning, problem solving, and judgment. These deficits can be perceived by lay persons as 'meanness' or antisocial behavior, but with expert evaluation and explanation are properly explained as deriving from disruption and impairments to the nervous system." 476 F.3d at 1144. Evidence of this type "serves to humanize a defendant." *Id.* at 1147.

In *Smith*, this Court found IAC for failure to investigate and present mitigating evidence, including evidence of brain damage. 379 F.3d at 944. The Court found, "The jury already had evidence of Mr. Smith's impulsiveness and lack of emotional control. What the jury wholly lacked was an *explanation* of how Mr. Smith's organic brain damage caused these outbursts of violence . . . ." *Id.* at 943. The same is true in Frederick's case. Rowan told Frederick's jury:

> [W]e have to acknowledge the incredible pain that Darrell Frederick has visited upon his own family by killing the one person in his life that really loved him. . . . We don't have a justification for that. It's inexcusable. . . . But we tried hard to find an explanation. Something

75

that would explain . . . his violent episodes that you've seen time and time again. From a standstill start to going off . . . with no preparation, no warning, no nothing. That's not normal.[42]

Tr.VIII 1582. Contrary to counsel's statements, there was a scientific explanation for Frederick's actions, but counsel failed to present expert testimony to provide it.

In addition to being legally unreasonable, OCCA's prejudice findings were factually unreasonable. OCCA unreasonably found that McGarrahan concluded Frederick's brain damage "would not impair his day-to-day activities, and that she could not draw any connection between any brain damage and his criminal conduct." ROA 363. The district court erroneously endorsed this finding. ROA 660. Although McGarrahan initially agreed frontal lobe damage does "[n]ot typically" impair "day-to-day activities like planning a trip to the grocery store or a grocery list and buying groceries" or holding certain jobs, McGarrahan immediately explained that such damage does impact other day-to-day activities like "making complex decisions," "interacting with other people," "see[ing] the gray area," and "abstract reasoning . . . in order to engage in relationships." Evid.Hr.IV 782-83. Her testimony was important for the jury to hear because it showed the impact of Frederick's brain damage *not* on his ability to grocery shop or hold a job, but on his alleged criminal conduct, including unprovoked and violent conduct toward family members – that is,

---

[42]In *Smith*, the Court found "[a]t times, counsel's references to Mr. Smith's mental condition read like an argument for the State," and pointed to an excerpt in which defense counsel, like Rowan here, repeatedly argued regarding the crime, "That's not normal behavior." 379 F.3d at 940-41. The *Smith* Court found counsel "never sought to define" an explanation for the crime despite the availability of "significant" mitigation evidence, including brain damage. *Id*. at 941. The same is true here.

on his ability to make complex decisions, interact with other people, and reason abstractly "in order to engage in relationships."[43] Evid.Hr.IV 783.

OCCA's determination that McGarrahan concluded that she "could not draw any connection between any brain damage and his criminal conduct" was similarly unreasonable. ROA 363. At the hearing, McGarrahan had the following exchange with the State:

> Q:    . . . [A]s a neuropsychologist you really can't even draw any connection between whatever brain damage he may have and any crimes he's ever committed, can you?
>
> A:    Right. I can't make this direct link. That's correct. . . . We can talk about the – the history of aggression and the history of violence and the difficulties he's having in his thinking and his emotion and his behavior, but I cannot make that direct link.

Evid.Hr.IV 785-86. Although McGarrahan testified she "cannot make that direct link," Evid.Hr.IV 786, she didn't conclude she could not draw *any* connection between Frederick's brain damage and alleged criminal conduct. On the contrary, as already described, she testified extensively about how Frederick's brain damage could have contributed to his alleged behavior. *See supra* at 67-68. As the district court acknowledged, ROA 660, she testified Frederick's frontal lobe damage was "certainly a contributing factor" to his behavior, Evid.Hr.IV 795. She explained:

> [I]f these things occurred and it occurred from the brain injury when he was 14, that's hard to parcel out from everything else that has befallen.

---

[43]The district court stated McGarrahan "did not presently see any diminution in Petitioner's day to day activities." ROA 660 (citing Evid.Hr.IV 781-82). However, when asked if she "presently" saw "diminution in his functioning day-to-day," McGarrahan specified, "Within the institutional setting, no." Evid.Hr.IV 781-82. This testimony wouldn't have undercut the evidence that brain damage contributed to Frederick's behavior outside of "the institutional setting." Evid.Hr.IV 782.

> *. . . But I do think when you look at the test data that we have that it is*
> *at least partially explainable by damage to the brain.*

Evid.Hr.IV 795 (emphasis added). McGarrahan did make a connection between Frederick's brain damage and alleged criminal conduct, and OCCA's finding to the contrary was unreasonable.

OCCA determined "the introduction of . . . brain damage . . . would have given the State ample ground to underscore and highlight th[e] antisocial personality evidence before the jury." ROA 363. The district court erroneously endorsed this finding. ROA 661-62. OCCA failed to take into account the evidence that blunted the negative impact of Grundy's finding of Antisocial Personality Disorder ("ASPD"). McGarrahan testified that "essentially 75 to 80 percent of the people in our prisons . . . meet the criteria for [ASPD]." Evid.Hr.IV 786. ASPD and brain damage are "not mutually exclusive." Evid.Hr.IV 780. Instead, "many of the behaviors -- the impulsivity, the irresponsibility, the aggression -- that define[] [ASPD] are also behaviors that you see in people with the frontal lobe damage." Evid.Hr.IV 780. She explained, "[ASPD] are merely the behaviors that somebody engages in. The brain damage is what we're seeing with Mr. Frederick that I believe is guiding those behaviors of [ASPD] that lead to that diagnosis." Evid.Hr.IV 798. McGarrahan testified "the etiology [of Frederick's ASPD behaviors] is at least in part due to brain damage."[44] Evid.Hr.IV 795.

_____

[44]In *Sears*, where counsel failed to present mitigating evidence including frontal lobe damage, the Supreme Court remanded the case for a prejudice determination:

> [E]vidence of Sears' grandiose self-conception and evidence of his

OCCA unreasonably determined the experts' testimony "could reasonably be viewed as mitigating to one person and aggravating to another." ROA 364. The district court erroneously endorsed this finding. ROA 661. Even if this Court accepts that mental-health evidence can be "double-edged," *Smith* (*Michael*) *v. Duckworth*, 824 F.3d 1233, 1249-50 (10th Cir. 2016), in this case – where Frederick was 59 years old at his trial – it was not. McGarrahan testified:

> [E]arly on when you couple the damage to the frontal lobes with his young age and hormones that are going on at a young age, you get the unprovoked aggression. You typically don't see unprovoked aggression even with frontal lobe damage in individuals who are in their fifth and sixth decade of life. At this point he's becoming more docile and having more difficulties in his thinking[45] than he is in his behavior.

Evid.Hr.IV 791. The court noted, "I sat through a couple of weeks of trial, we've been sitting here all day, Frederick's been nothing but a gentleman sitting here." Evid.Hr.IV 790. While Frederick's brain damage could have explained his past alleged behavior, it would not have indicated future dangerous behavior and been "viewed as . . . aggravating."[46] ROA 364.

---

> magical thinking . . . were features, in another well-credentialed expert's view, of a "profound personality disorder." [Citation omitted.] This evidence might not have made Sears any more likable to the jury, but it might well have helped the jury understand Sears, and his horrendous acts – especially in light of his purportedly stable upbringing.

561 U.S. at 951.

[45]McGarrahan believed Frederick has "memory issues . . . headed in the direction of dementia." Evid.Hr.IV 784.

[46]In her report, McGarrahan explained:

79

The district court erroneously found:

> While this testimony [regarding Frederick's becoming more docile as he ages] may be useful in rebutting the State's future dangerousness aggravator, it also undercuts Petitioner's argument that his brain damage somehow explains his violent acts. Petitioner was in his fifties when he committed this crime, which, according to his own expert, is a time when "[y]ou typically don't see unprovoked aggression even with frontal lobe damage." [Citation omitted.] Thus, while Petitioner may wish to portray this testimony as mitigating, it can also reasonably be interpreted as showing that Petitioner's brain damage is not the cause of his violent outbursts and he is instead just a violent person.

ROA 661. McGarrahan's testimony on this point was not about whether brain damage can cause unprovoked aggression in older individuals, but was instead about whether older individuals typically display unprovoked aggression in the first place. McGarrahan's testimony was simply that younger individuals are "at higher risk for aggression," and that – due to decreasing levels of testosterone with increasing age – unprovoked aggression in older individuals is not typical, even in individuals with brain damage. Evid.Hr.IV 790-91. While McGarrahan testified that someone of Frederick's age would be at lower risk of unprovoked aggression, Evid.Hr.IV 790, she didn't suggest that brain damage could not cause such aggression. Regardless of how atypical unprovoked aggression was at Frederick's age, the jury believed he

---

> Mr. Frederick can function well in a structured, consistent environment, and this is evidenced by his lack of disciplinary problems over the last several years in prison. . . . Should behavior problems manifest from his cognitive impairment, these can be addressed with psychotropic medication . . . Further, with increased age, it is expected that there will be reductions in acting out/impulsive behavior, while cognitive impairments will be more readily identifiable.

ROA 411 (citations omitted).

committed this crime (and possibly other violent acts used as aggravation); the jury lacked an explanation. McGarrahan's testimony about decreased unprovoked aggression at older ages wouldn't have undercut the explanation that Frederick's brain damage contributed to his actions at the time of the crime, and her other testimony would have supported that explanation. *See supra* at 67-68.

Even assuming this testimony could have "undercut[] [the] argument that his brain damage somehow explains" the alleged crime, ROA 661, there need not be a nexus to the crime for evidence to be mitigating. *See Tennard v. Dretke*, 542 U.S. 274, 287 (2004). Frederick's brain damage explained past allegations of violence, and needed not explain the alleged murder had counsel performed effectively and rebutted the State's evidence and argument that a homicide occurred, s*ee* Proposition One (B)(1), and presented the other available mitigating evidence, *see* Proposition One(B)(2). *See Cargle*, 317 F.3d at 1212-20 (all instances of counsel's deficient performance should be cumulated); *Hooks*, 689 F.3d at 1207 (finding prejudice, where "proper presentation of the family-history and mental-health evidence, not to mention the circumstances surrounding [the] conviction, would have been 'powerful mitigation'").

As the district court found, Rowan "made the effects of Petitioner's childhood head injury the central theme of his mitigation case." ROA 658. It was prejudicial for him not to present evidence of that theme. Even if the district court were correct that McGarrahan's testimony could have been interpreted to show that Frederick's brain damage did not cause Frederick's actions during the alleged crime, there is a reasonable likelihood the evidence of his brain damage – particularly in conjunction

with all the other available but unpresented mitigation evidence – could have swayed one juror. *Wiggins*, 539 U.S. at 537.

## PROPOSITION TWO

**THE ACCUMULATION OF ERRORS VIOLATED FREDERICK'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

**A.    Where the Claim Was Raised.**

This claim was raised in Ground Four of Frederick's habeas petition. ROA 321. The district court denied relief. ROA 676-77.

**B.    Arguments and Authorities.**

To obtain habeas relief on cumulative error, this Court must find "the cumulative effect of the errors determined to be harmless had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Hanson v. Sherrod*, 797 F.3d 810, 852 (10th Cir. 2015) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).This Court has granted the Writ, in part, for cumulative error in a case involving multiple types of error. *See Cargle*, 317 F.3d at 1224-25. A proper cumulative analysis includes all instances of counsel's deficient performance, even if individual instances of deficient performance are denied for lack of prejudice. *Id*. at 1220-21. No individual error can be harmless unless it is harmless in context, including in context of other errors. *O'Neal v. McAninch*, 513 U.S. 432, 437-38 (1995).

Here, the synergy of errors demands relief. In a case with a viable first-stage defense that reasonably could have led to an acquittal, counsel didn't call a single witness, consult with a single expert, attempt to interview the M.E., or subject the

State's case to effective cross-examination. These failures followed Frederick into the sentencing phase and gutted a powerful form of mitigation: residual doubt. *See supra* at 22. These failures were compounded by counsel's failure to investigate or present almost any mitigation.

What little mitigating evidence trial counsel did present was then denigrated when the prosecution uttered the following statement during the State's final, penalty-stage closing argument: "We're not here to do justice for [Frederick]. He is not why we're here. We're here to do justice for Connie Frederick. That's why we're here." Tr.VIII 1590. *See* ROA 677 (federal district court noting OCCA found this statement to be error). Any suggestion the jury should disregard justice for a defendant and instead focus solely on justice for the victim during a capital sentencing proceeding is highly improper. "Arguments that improperly encourage the jury to impose a sentence of death based on considerations of sympathy for the victims may constitute a due process error." *Le v. Mullin*, 311 F.3d 1002, 1015 (10th Cir. 2002) (citing *Payne v. Tennessee*, 501 U.S. 808, 831 (1991) (O'Connor, J., concurring)).

Because OCCA didn't examine all of the errors for their cumulative effect, federal review is *de novo* rather than under AEDPA deference. *See Cargle*, 317 F.3d at 1224. These issues warrant relief individually but also for their cumulative effect.

## <u>CONCLUSION</u>

Frederick respectfully requests this Court reverse the district court with instructions to grant the Writ or to hold an evidentiary hearing.

## STATEMENT REGARDING ORAL ARGUMENT

Counsel request oral argument. Due to the complex legal and factual issues in this capital case, oral argument will materially assist the Court in adjudicating these matters.

Respectfully Submitted,

*s/ Meghan LeFrancois*
MEGHAN LeFRANCOIS, OBA #32643
EMMA V. ROLLS, OBA #18820
Assistant Federal Public Defenders
Western District of Oklahoma
215 Dean A. McGee Ave., Suite 707
Oklahoma City, Oklahoma 73102
(405) 609-5975 telephone
(405) 609-5976 facsimile
Meghan_LeFrancois@fd.org
Emma_Rolls@fd.org

COUNSEL FOR PETITIONER/APPELLANT,
DARRELL WAYNE FREDERICK

## **CERTIFICATE OF DIGITAL SUBMISSION**

I certify that with respect to the foregoing Appellant's Opening Brief that: (1) all required privacy redactions have been made pursuant 10th Cir. R. 25.5; (2) the hard copies submitted to the Court via ECF submission are exact copies of the version submitted electronically, and (3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Symantec Endpoint Protection, Version 14. 000.15.105, updated daily, and according to the program, is free of viruses.

*s/ Meghan LeFrancois*
MEGHAN LeFRANCOIS, OBA #32643
Assistant Federal Public Defender

## **CERTIFICATE OF COMPLIANCE**

1.  ***Petitioner/Appellant's Opening Brief*** complies with the type-volume limitation of Fed. R. App. P. 32(g) because this brief contains 23,000 words, excluding the parts of the brief exempted by Fed. R. App. P.32 (f).

2.  ***Petitioner/Appellant's Opening Brief*** complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32 (a)(6) because this brief has been prepared in proportionally spaced typeface using Word Perfect Version X6 in 14-point Times New Roman font.

Dated October 22, 2021.

*s/ Meghan LeFrancois*
MEGHAN LeFRANCOIS, OBA #32643
Assistant Federal Public Defender

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of October, 2021, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Julie Pittman, Assistant Attorney General
Jennifer L. Crabb, Assistant Attorney General
Julie.Pittman@oag.ok.gov
Jennifer.Crabb@oag.ok.gov,
fhc.docket@oag.ok.gov
Counsel for Respondent


*s/ Meghan LeFrancois*
MEGHAN LeFRANCOIS, OBA #32643
Assistant Federal Public Defender